2 Cal.App.4th 935 (1992)
3 Cal. Rptr.2d 627
In re CORY M., a Person Coming Under the Juvenile Court Law.
JAMES A. RYDINGSWORD, as Director, etc., Plaintiff and Respondent,
v.
TANYA M., Defendant and Appellant.
TANYA M., Petitioner,
v.
THE SUPERIOR COURT OF CONTRA COSTA COUNTY, Respondent;
CONTRA COSTA COUNTY SOCIAL SERVICE DEPARTMENT et al., Real Parties in Interest.
Docket Nos. A053060, A054638.
Court of Appeals of California, First District, Division Three.
January 16, 1992.
*940 COUNSEL
Leah Hess, under the appointment by the Court of Appeal, for Defendant and Appellant and for Petitioner.
Victor J. Westman, County Counsel, Paul R. Muniz, Victoria T. Williams and Michael D. Farr, Deputy County Counsel, for Plaintiff and Respondent and for Real Parties in Interest.
No appearance for Respondent Superior Court.
OPINION
CHIN, J.
Tanya M. gave birth to a son, Cory M., on September 10, 1988. Because of Tanya's psychiatric problems, Cory has lived with Tanya's parents since his birth. Tanya's parents are now seeking to adopt Cory. By writ and appeal, Tanya challenges a permanency planning order (Welf. & Inst. Code, § 366.25[1]) that terminates reunification services and authorizes proceedings to terminate her parental rights (Civ. Code, § 232). We conclude that the court erred in ordering institution of proceedings to terminate Tanya's parental rights.

FACTS AND PROCEDURES
Tanya was 22 years old and single when Cory was born. She had lived with Cory's father on and off for one or two years, but they split up before Cory's birth. When Cory was born, Tanya was living with her mother and stepfather in San Ramon.
*941 On September 21, 1988, 11 days after Cory's birth, Tanya was voluntarily admitted to Walnut Creek Hospital where Dr. Alonza Johnson, the attending psychiatrist, tentatively diagnosed postpartum psychosis. After a three-week stay, she was released and returned to her parents' residence. Within two weeks, Tanya agreed to be readmitted to the hospital. The next week, the Contra Costa County Social Service Department (Department) filed a petition to declare Cory a dependent child of the juvenile court. Tanya admitted the allegations of the petition, and on November 15, 1988, the court took jurisdiction over Cory. (§ 300, subd. (a).) On December 6, 1988, the court ordered Cory placed with Tanya's parents. The matter was continued to May 16, 1989, for review.
Review hearings were held May 16, 1989 (6-month review), December 12, 1989 (12-month review), and periodically during 1990 (18-month review). After each, Cory remained with Tanya's parents, with visitation and reunification services provided to Tanya. After a two-part hearing held January 4 and 16, 1991, the court issued its permanency planning order. (§ 366.25.) The order, filed March 27, 1991, found that although Tanya met most of the reunification requirements, reunification services should be terminated. The court concluded that the Department met its burden of proving that a permanent plan should be made for Cory's adoption. This combined appeal and writ proceeding challenges the court's order.

Psychiatric Evidence
Tanya received psychological treatment, off and on, beginning in sixth or seventh grade. She began regular therapy with LaVerne Lamach when she was 16 years old. At the time, her parents were concerned with her temper outbursts and manipulative behavior. Her initial hospitalization, shortly after Cory's birth, came when Tanya's parents became concerned about Tanya's lack of impulse control and the risk to the minor due to her irrational behavior. Dr. Alonza Johnson, the attending psychiatrist, diagnosed postpartum psychosis.
Shortly after her release from the hospital, Tanya's mother reported an incident of Tanya's yelling and screaming at her mother and threatening suicide. At Dr. Johnson's urging, Tanya agreed to readmit herself to the hospital. Dr. Johnson prescribed Lithium to attempt to stabilize Tanya. The hospital's prognosis upon her release was "[P]oor. First of all, she has had at least 6 to 7 years of untreated manic illness. It was not until the delivery of her baby approximately 6 weeks prior to this hospitalization that her illness became so severe that she had to have hospitalization.... Another factor arguing for a poor prognosis is that mixed in with her major affective *942 disorder, the patient also has a very dependent personality disorder. She and her mother have formed a malignant symbiotic bonding in which the two of them cannot stay away from each other, yet at the same time they cannot live with each other."
At Dr. Johnson's recommendation, Tanya was released to the Nierika House, a crisis residential treatment facility in Concord, where she received individual and group counseling. She also continued to see Lamach. At that point, Dr. Johnson made the following diagnosis: "Axis I: Bipolar affective Disorder manic type, with psychosis [¶] Axis II: Borderline personality disorder, severe, with histrionic features [¶] Axis III: Exogenous obesity." He gave a guarded prediction that with proper response to a year of treatment she might be able to care for Cory.
At first, Tanya cooperated with her psychiatrist and took her medication. But within six months to nine months, against Dr. Johnson's advice, she discontinued the medication. She continued her treatment with Lamach, who reported that she was functioning well and beginning to identify and work on her anxieties. At some point during the year following her hospitalization, Tanya moved into an apartment in Concord and took a job as a telephone solicitor for a magazine sales agency. She reported that she was feeling better without the medication and that she was seeing Dr. Johnson only rarely. She continued to see Lamach weekly.
In early 1990, Dr. Johnson met with Tanya, but could not evaluate her because she would not cooperate with him. She refused to sign a consent for Dr. Johnson to release information to the Department. She also refused to sign a form permitting Lamach to release information to the Department. In August of 1990, Tanya's parents and the Department moved the court for an order appointing a psychotherapist to examine Tanya and report to the Department on her condition. (Evid. Code, § 730.) The court granted the motion.
The court appointed Dr. John Mahoney, who in turn referred Tanya to Richard Pollack, a licensed clinical psychologist, for psychological testing. Pollack reported that Tanya had a borderline personality disorder  "moderate to severe psychopathology which is currently, apparently, under adequate control"  but he concluded that she was no worse off emotionally than many parents. He could not rule out Tanya's being able to care for Cory, but he did say that he might change his opinion if he obtained a more detailed recent psychological history. A few weeks later, having reviewed additional background material not previously available to him, Pollack changed his conclusions somewhat. He reported that he was "especially troubled that she *943 refuses to allow her therapist and psychiatrist to provide information. They know her best, and would be in a position to comment knowledgeably on her ability to be an adequate parent." He stated that he could not recommend Tanya be given custody without information from her therapist and psychiatrist supporting the idea that she would be an adequate parent.
Dr. Mahoney reviewed Pollack's report and examined Tanya. His written evaluation, dated December 26, 1990, diagnosed psychiatric disorders and recommended Tanya not be reunited with Cory at that time. Dr. Mahoney suggested that she might recover enough to regain custody, but that she would need psychotherapy and psychiatric evaluation/treatment by people in regular communication with the Department. In Dr. Mahoney's opinion, a trial of medication might help Tanya make further progress.

Evidence About Visitation
From the beginning, Tanya has visited with Cory on a regular basis, first at her parents' home and then at neutral locations. She visited Cory for about five hours a week in her parents' home during the first year of their custody. But she objected that she could not effectively visit in her parents' home, and requested alternative visitation locations. Eventually, by early 1990, the Department had arranged for supervised visits in Tanya's apartment and at the Department offices. Tanya's mother began to object that the visits were becoming difficult and disruptive for Cory.
By the summer of 1990, Tanya's parents had moved with Cory to a Sacramento suburb. By agreement, the parties arranged for visitation two times a week, one at the Department office in Martinez, and the other at some community location in Sacramento County. The Sacramento visits were delayed two months because volunteers were not available on weekends to transport Tanya to Sacramento and supervise the visits. At around the same time, out of concern for Cory's welfare and because meeting the visitation agreement caused increasing stress on him and on Tanya's parents, Tanya's parents began aggressively seeking to adopt Cory. Tanya raised the question of overnight visitations, but the Department recommended against them in favor of Cory's "daily security of one home, the same home and bed at night."

Evidence of Parenting Skills
At first, Tanya showed little parenting competence and appeared ambivalent about being a parent. Tanya's mother reported various parenting lapses, which Tanya denied or explained away. During the visitations at Tanya's *944 mother's house, Tanya seemed to need cues and reminders from her mother, who took the lead in planning Cory's day. The Department considered visitation at Tanya's mother's home unsuccessful because the environment was unworkable.
By the time of the hearing from which the challenged order arose, the reports on Tanya's parenting skills were positive. The only lingering complaint was that when an observer was present, Tanya's attention tended to wander from Cory and to focus on herself or on some other person or activity.

Reunification Plan
The initial plan for reunifying Tanya with Cory set up 10 requirements, including continuing mental health treatment as outlined by Tanya's attending psychiatrist/psychologist, signing a release authorizing an exchange of information between treatment staff and the Department, and meeting various requirements for visiting Cory and maintaining a stable living arrangement. The reunification plan remained substantially the same throughout the proceedings leading up to the challenged order. At the final permanency planning hearing, the court concluded that Tanya had not complied with the reunification plan and that reunification services should be terminated.

The Court's Order
The court's written order stated that "although mother Tanya [M.] met most of the requirements of her Family Reunification Plan, the following appears from the evidence:
"1. Dr. Mahoney concluded that mother demonstrates ambivalence in her attention to the child; may not have the patience or ability to care for the minor; may continue to have problems with her emotional control under pressure; and, by his total analysis, concluded she is still disabled as a caretaker by her psychiatric disorder.
"2. Dr. Pollack concluded that he cannot recommend custody to mother without information from her therapist and psychiatrist supporting the idea that she can adequately parent.
"3. The mother was directed by the Family Reunification plan to follow the course of treatment directed by her psychiatrist, including medication; she refuses to medicate despite the direction of the psychiatrist, and no longer sees him.
*945 "4. The above findings relate directly to the issue from which jurisdiction was derived; mother's psychiatric illness which prevented adequate parenting.
"5. The mother refuses to allow reports from her treating therapists.
"6. The reasons for jurisdiction still exist and have not been corrected by the level of the mother's compliance with the Family Reunification plan.
"7. The Department of Social Service has met its burden.
"8. Mother Tanya [M.]'s Family Reunification services are terminated.
".... .... .... .... .... .... ....
"10. The minor is young, in good health, appealing, active, developing well in growth and development, affectionate, needing to be nurtured, ambivalent towards visits with his mother, bonded to his caretakers (maternal grandparents).
"11. The minor is adoptable."

WHAT IS THE CORRECT FORM OF REVIEW?
(1) "An order by the court that authorizes the filing of a petition to terminate parental rights pursuant to Section 232 or that authorizes the initiation of guardianship proceedings is not an appealable order but may be the subject of review by extraordinary writ." (§ 366.25, subd. (j).) Tanya has filed both a notice of appeal and a petition for writ of mandate and/or prohibition. She has done so because of uncertainty about the meaning of the court's various actions.
The court's signed minute order for January 16, 1991, stated in longhand: "The Court takes the matter under submission. Parties to be notified by Memo of Decision. (Memo of Decision mailed 1-28-91.)" But, paradoxically, someone checked the boxes making permanency planning findings. Thus the order also stated: "There is not a substantial probability that minor will be returned to custody of his/her parent(s)/guardian(s) within six months. [¶] The minor is adoptable. [¶] Co. Counsel shall initiate an action pursuant to C.C. Sec. 232 to declare minor permanently free from custody & control of his/her parents."
The court's memorandum of decision, filed January 28, 1991, explained the reasons for finding Cory adoptable and for doubting Tanya's ability to *946 parent him adequately. But it did not specifically authorize filing a petition to terminate parental rights under Civil Code section 232. Nor did the court's order of March 27, 1991, quoted above, specifically authorize filing of a Civil Code section 232 petition.
Tanya acknowledges that the record suggests that the court intended to issue an order initiating Civil Code section 232 proceedings. But she appeals the court's failure to make the required order, and she simultaneously seeks writ review of the order the court did make, in case it might be considered an order initiating Civil Code section 232 proceedings.
Writ review is appropriate. Although Tanya may legitimately question the timing of the court's minute order, she cannot question that it is a signed order of the court directing county counsel to initiate proceedings under Civil Code section 232 to declare Cory free from parental control. By statute the order is not appealable but may be challenged by a petition for a writ. (§ 366.25, subd. (j).) To the extent it challenges the court's referral of the matter for Civil Code section 232 proceedings, we dismiss Tanya's appeal.

PERMANENCY PLANNING IN GENERAL
In re Johnny M. (1991) 229 Cal. App.3d 181 [279 Cal. Rptr. 693] provides a clear and concise summary of the legal framework for the decisions made in this case: "Under section 361.5, if the juvenile court removes a minor from the custody of his or her parents, the court must order child welfare services for the minor and the parents for the purpose of facilitating reunification of the family. The reunification services are for a maximum period of 12 months except that they can be extended 6 months if it can be shown that the objectives of the service plan can be achieved within that extended period of time. (§§ 361.5, 16507.) `[I]t is open to question whether a court has discretion to order further reunification services after 18 months. (See, e.g., In re Michael S. (1987) 188 Cal. App.3d 1448, 1461, fn. 4....)' (In re Corienna G. (1989) 213 Cal. App.3d 73, 81 ....)
"Section 366 mandates continuing judicial review of the status of each child in foster care, with reviews at least every six months. The review times are calculated from the date of the original dispositional hearing. The reviews continue until the permanency planning hearing is completed. (After the permanency planning hearing is completed, periodic reviews are conducted pursuant to §§ 366.3 and 16503.)
"If, at the judicial review hearing, the court finds that returning the child to the custody of his or her parents would create a substantial risk of *947 detriment to his or her well-being, it does not make the return. The court can order additional reunification services. (§ 366.2.)
"Under section 366.25, if the minor child has not yet been returned home pursuant to section 366.2, subdivision (e), then the court must hold a hearing to develop a permanent plan for the minor. There are three types of permanent plans  adoption, long-term foster care and legal guardianship. (§ 366.25; In re Heather P. [1989] 209 Cal. App.3d [886], 889, fn. 5 [257 Cal. Rptr. 545].) The permanency plan hearing is held no later than 12 months after the original dispositional hearing and it can be combined with a section 366 six-month review. (§ 366.25, subd. (a).)
"At the permanency plan hearing, the court first determines if the child should be returned to the physical custody of his or her parent, pursuant to subdivision (e) of section 366.2 [quoted in omitted footnote]. If the minor is not to be returned, the court next determines whether there is a substantial probability that the child can be returned within the next six months. If the court makes a finding of substantial probability, it must set another review hearing for not more than six months. Then, if the child is not returned to his or her parents at that next hearing, the court must develop a permanent plan for him or her. (2) `There is no provision in the statutes for any permissible further delay in making a permanent plan for a dependent child. At a second, 18-month permanency planning hearing, a court must thus either order children returned to their parents' custody or, if reunification efforts have failed, make an alternative permanent plan for them.' (In re Corienna G., supra, 213 Cal. App.3d at p. 84.)" (In re Johnny M., supra, 229 Cal. App.3d at pp. 187-189, fns. omitted; see also In re Kristin W. (1990) 222 Cal. App.3d 234, 250-251 [271 Cal. Rptr. 629].)

DID THE COUNTY PROVIDE REASONABLE REUNIFICATION SERVICES?
(3a) Focusing primarily upon the problems in visiting with Cory at Tanya's parents' home and in the Department offices, and upon her opinion that the social worker was biased against her, Tanya contends that reunification services provided to her and Cory were not adequate. She also argues that the reunification plan unreasonably required her to continue treatment by her psychiatrist and, if ordered, to take medication.
(4) "A good faith effort to develop and implement a family reunification plan is required. [Citation.] A reunification plan `"must be appropriate for each family and be based on the unique facts relating to that family."' [Citation.] This reunification plan is a crucial part of the dispositional order. [Citation.] In light of the mandatory language of the statutes and the rule, *948 `"failure to formulate an adequate reunification plan [has] been held to be reversible error under rule 1376(b) [Cal. Rules of Court]."' [Citation.]" (In re Kristin W., supra, 222 Cal. App.3d at p. 254.)
(3b) On the record before us, we cannot fault either the Department or the court for the reunification services provided. Understandably, the Department first tried visitations at Tanya's parents' home. When difficulties arose, the Department tried to work them out. Ultimately, it changed the location for the visits. The Department went to great lengths to provide supervision for the visits and even transportation for Tanya after Cory moved to the Sacramento area.[2] We address the questions of psychiatric care and medication next.

DID THE DEPARTMENT MEET ITS BURDEN OF SHOWING SUBSTANTIAL RISK OF DETRIMENT?
(5) Tanya asserts that the crux of this case is her psychiatric disability, discontinuance of medication, ceasing to see Dr. Johnson, and refusing to permit treatment providers to release information to the court. She says that these facts do not support a finding that Cory would be harmed by returning to her. She points out that detriment may not be presumed from mental illness (In re Jamie M. (1982) 134 Cal. App.3d 530, 540 [184 Cal. Rptr. 778]) and contends that instead of requiring that the Department prove detriment, the court placed the burden on her by relying upon her failure to release her treatment records.
The court here expressly placed the burden of proof as to detriment on the Department. (§§ 366.2, subd. (e), 366.22, subd. (a); In re Heather P. (1988) 203 Cal. App.3d 1214, 1227 [250 Cal. Rptr. 468].) But it also noted Tanya's failure to participate in ordered treatment programs and criticized her refusal to provide information about her treatment. We conclude that the court properly shifted the burden of presenting evidence to Tanya and that she failed to present sufficient evidence to rebut the Department's showing of detriment.
The same statutes which place the burden on the Department, in the next sentence state that "The failure of the parent or guardian to participate regularly in any court-ordered treatment programs shall constitute prima facie evidence that return would be detrimental." (§§ 366.2, subd. (e), *949 366.22, subd. (a).) (6) Tanya asserts that she did not fail to participate in a court-ordered treatment program and says that if she did, her failure was justified because the court's order was unreasonable. She contends that the court did not order treatment with Dr. Johnson or order that medication be taken as a condition to reunification. She insists that treatment by her therapist, Lamach, satisfied the court's reunification plan.
Tanya correctly identifies an ambiguity in the reunification plan, which required her to follow the course of treatment outlined by her "attending psychiatrist/psychologist." Taken alone this phrase might have referred only to her therapist, Lamach. But the next sentence identified "medication" as a possible course of treatment, suggesting that the court was ordering her to comply with treatment plans of both Lamach and Dr. Johnson. Subsequent reports, which focused upon whether Tanya was taking her medication, confirmed that treatment by Dr. Johnson was part of Tanya's reunification plan.
If, as Tanya claims, Dr. Johnson's program of medication constituted unreasonable treatment for her condition, she waited too long to say so. At any of the several reviews conducted by the court, Tanya could have presented evidence that Dr. Johnson's treatment program was unnecessary or inadvisable. We find no indication in the record that she brought forth such evidence. Nor did she aggressively challenge the progress reports which criticized her failure to follow Dr. Johnson's treatment plan. Under the pertinent statutes, Tanya's failure to follow the prescribed treatment program furnished prima facie evidence of detriment.
(7) It was incumbent upon Tanya to rebut the prima facie case by producing evidence that she was emotionally and mentally fit to care for Cory. (See 1 Witkin, Cal. Evidence (3d ed. 1986) Burden of Proof and Presumptions, §§ 127-129, pp. 113-115.) Some evidence suggested that she has been able to cope reasonably well without medication. But she failed to present critical expert evidence about her current mental condition and how it might affect Cory. The only current expert evidence was adverse to Tanya. Dr. Mahoney concluded that Tanya was disabled as a caretaker and should not be reunited with her son. Pollack could not recommend custody without information from Tanya's therapist and psychiatrist supporting the idea that she would be an adequate parent.
Tanya faced a hard decision: whether to waive her psychotherapist/patient privilege and present expert evidence about her fitness or to assert the privilege and leave the prima facie case of unfitness substantially unrebutted. She elected to maintain confidentiality for the reports of both Dr. Johnson *950 and Lamach. By doing so, she denied the court crucial evidence about whether her unmedicated treatment program was succeeding. Because the burden of presenting evidence had shifted to her, she hindered her own cause.
From the record before us, we cannot determine whether Tanya's assertion of psychotherapist/patient privilege stemmed from concern that her mother might become privy to her private comments. If so, she should have raised that concern with the court and sought an order limiting the scope of disclosure of her therapists' reports. The court showed willingness to accommodate Tanya's privacy concerns by appointing an independent psychiatrist to examine her. But his results did not help Tanya's position, and they too were hindered by her failure to provide access to her treatment records.
Tanya could not have it both ways. If she wanted Cory returned, she could not refuse to follow the court's therapy plan and also refuse to release to the court information about the success of her own plan. The court correctly found that the Department had met its burden on the issue of detriment. The court properly moved to the next step  determining what permanent plan was appropriate for Cory. The final question before us is whether the court correctly determined that adoption was the appropriate plan.

WOULD CORY BENEFIT FROM CONTINUING HIS RELATIONSHIP WITH TANYA?
(8) Tanya contends that the court erred in ordering institution of termination proceedings without first determining that Cory would not benefit from continuing contact with her. We agree.
Section 366.25, subdivision (d), provides that if the court determines that a child cannot be returned to his or her parent, "[i]n order to enable the minor to obtain a permanent home the court shall make the following determinations and orders: [¶] (1) If the court finds that it is likely that the minor can or will be adopted, the court shall authorize the appropriate county or state agency to proceed to free the minor from the custody and control of his or her parents or guardians pursuant to Section 232 of the Civil Code unless the court finds that any of the following conditions exist: [¶] (A) The parents or guardians have maintained regular visitation and contact with the minor and the minor would benefit from continuing this relationship. [¶] (B) A minor 10 years of age or older objects to termination of parental rights. [¶] (C) ... [¶] (2) If the court finds that it is not likely that the minor can or will be adopted or that one of the conditions in subparagraph (A), (B), or (C) of paragraph (1) applies, the court shall order the appropriate county *951 department to initiate or facilitate the placement of the minor in a home environment that can be reasonably expected to be stable and permanent. This may be accomplished by initiating legal guardianship proceedings or long-term foster care...."
Rule 1462(a)(3) of the California Rules of Court specifies procedures for implementing the above quoted subdivision: "If the court determines that there is no substantial probability of return within 18 months of the original detention order or if 18 months have elapsed, the court shall develop a plan to provide the child with a stable, permanent home. In developing the plan, the court shall determine whether it is likely that the child can or will be adopted and, if it so finds, the court shall determine whether one or more of the following conditions exist: [¶] (A) The parent or guardian has maintained regular visitation and contact with the child and the child would benefit from continuing the relationship. [¶] ... [¶] If the court finds that none of the conditions exists, the court shall authorize the initiation of proceedings under Civil Code section 232." (Italics added.)
The Department contends that rule 1462 of the California Rules of Court conflicts with section 366.25, subdivision (d), and that the statute prevails over the rule. We find no conflict. Although worded in the negative, section 366.25, subdivision (d), clearly requires the court to determine whether the child would benefit from further contact with the parent before instituting proceedings which could lead to terminating contact. (In re Joshua S. (1986) 186 Cal. App.3d 147, 153 [230 Cal. Rptr. 437].) The court will authorize Civil Code section 232 proceedings "unless [it] finds" that the parents have maintained regular visitation and contact and that "the minor would benefit from continuing this relationship." Implicitly, before authorizing termination of parental rights, the court must find that the minor would not benefit from continuing the parental relationship.
(9a) We need not decide whether the court must support its determination by an express "finding" or whether a finding may be implied from other findings of the court. (In re Kristin W., supra, 222 Cal. App.3d at p. 253; In re Albert B. (1989) 215 Cal. App.3d 361, 374 [263 Cal. Rptr. 694].) In this case no finding suggests that the court ever determined whether Cory would benefit from further contact with Tanya. The Department says that the finding that "[t]he minor is adoptable" presupposes a determination that he would not benefit from further contact. We disagree. A finding that the minor is "adoptable" implies only that the child's health, age, development, personality, and personal characteristics make the child a likely candidate for adoption. (See In re Laura F. (1983) 33 Cal.3d 826, 838 [191 Cal. Rptr. 464, 662 P.2d 922].) This is only the first step  determining whether it is "likely *952 that the minor can or will be adopted...." It does not determine whether the condition stated in section 366.25, subdivision (d)(1)(A), exists.
The only trial court comment even obliquely addressing the question of whether Cory would benefit from further contact with Tanya is the remark that Cory was "ambivalent towards visits with his mother." The court made that remark in its memorandum of decision and its final order. But Cory's ambivalence about visits does not answer the question of whether he would benefit from them; it only focuses the question.
(10) Jones T. v. Superior Court (1989) 215 Cal. App.3d 240, 251 [264 Cal. Rptr. 4], a case similar in some respects to this case, rejects the argument that adoption is a less favored permanent plan than either guardianship or long-term foster care: "`The Legislature has expressed increasing concern with the perceived and accurate reality that time is of the essence in offering permanent planning for dependent children....' [Citation.] [¶] Moreover, continuity in foster placement is not equivalent to the security and stability of a permanent home. `The goal of permanency planning is to end the uncertainty of foster care and allow the dependent child to form a long-lasting emotional attachment to a permanent caretaker. "Foster placement, being temporary, does not do the trick because it warns the adults against any deep emotional involvement with the child. Even adoptive parents may hesitate to make a full commitment to the child as long as the placement is not irrevocable." [Citation.]' [Citations.] Although guardianship may be a more stable solution than foster care, it is not irrevocable and thus falls short of the secure and permanent placement intended by the Legislature."
(9b) Notwithstanding the legislative preference for adoption, institution of proceedings to terminate parental rights may take place only when the court has considered all the appropriate issues and made the required determinations based upon substantial evidence. The court here skipped a step when it decided that adoption was the appropriate permanent plan and directed county counsel to institute termination proceedings.
Let a peremptory writ of mandate issue directing the Contra Costa County Superior Court to (1) vacate its order directing county counsel to institute termination proceedings and (2) hear evidence and determine whether adoption is the appropriate permanent plan. If the court determines that Cory will not benefit from further contact with Tanya, it may reinstate the order *953 directing institution of termination proceedings. If it determines that Cory will benefit from further contact, it should select another permanent plan.[3]
White, P.J., and Merrill, J., concurred.
A petition for a rehearing was denied February 11, 1992, and appellant's petition for review by the Supreme Court was denied April 23, 1992.
NOTES
[1] All statutory references are to the Welfare and Institutions Code unless otherwise indicated.
[2] If, as suggested by the court in In re Kristin W., supra, 222 Cal. App.3d at page 248, the determination that reunification services were adequate is an appealable order, we affirm the court's decision. (But see In re Elizabeth M. (1991) 232 Cal. App.3d 553, 562-563 [283 Cal. Rptr. 483].)
[3] Insofar as it challenges the change in visitation which would accompany a permanent plan of adoption, the appeal is rendered moot by this decision. Insofar as the appeal challenges denial of Tanya's motion to return Cory to her custody and control, we reject the appeal on the merits and affirm the ruling on the motion. As we explained above, the Department met its burden of showing detriment to Cory if returned to Tanya.