Filed 12/10/13  Veronica M. v. Superior Court CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| VERONICA M.,<br><br>　　Petitioner,<br><br>　　　v.<br><br>THE SUPERIOR COURT OF ORANGE COUNTY,<br><br>　　Respondent;<br><br>ORANGE COUNTY SOCIAL SERVICES AGENCY et al.,<br><br>　　Real Parties in Interest. | G048848<br><br>(Super. Ct. No. DP-022456)<br><br>O P I N I O N |

Original proceedings; petition for a writ of mandate to challenge an order of the Superior Court of Orange County, Dennis J. Keough, Judge.  Petition denied.

Rebecca Captain for Petitioner.

Nicholas S. Chrisos, County Counsel, Karen L. Christensen and Julie J. Agin, Deputy County Counsel, for Real Party in Interest, Orange County Social Services Agency.

Veronica M. (mother) seeks extraordinary relief from an order of the juvenile court terminating reunification services and setting a permanency planning hearing for her child, A.C. After reviewing the petition on the merits, we deny relief. (Cal. Rules of Court, rule 8.452(h).)

**FACTS**

Mother gave birth to A.C. prematurely, at 34 weeks gestation, in January 2012. He weighed just five pounds, three ounces.

When A.C. was about five weeks old, a social worker visited the home to investigate a report of general neglect of the child by mother. The social worker's resulting report, which was inconclusive on abuse, stated the mother "has post partum depression, is not all there, and . . . made a statement that she wanted to throw the baby out the window." The report noted the baby's low birth weight and failure to gain weight: A few days before the social worker's visit, A.C. had been weighed at a clinic, registering just six pounds, one ounce. Mother and the presumed father, Ezequiel C. (father), with whom mother and baby were then living, signed a Children and Family Services Safety Plan, agreeing to participate in a Postpartum Wellness Program and Stress Free Families Program, to fill mother's prescription for antidepressant medication, and to take A.C. to the pediatrician.

In April 2012, mother and father brought 10-week-old A.C., vomiting and stricken with diarrhea, to the emergency room at the urging of a neighbor who was concerned the child was seriously underweight. Emergency room personnel found the baby's condition alarming: At 7 pounds, 12 ounces, he was below the third percentile in weight, had sunken eyes, skinny arms and legs, and a protruding belly. A doctor diagnosed A.C. with "failure to thrive" and determined the cause was environmental because, once admitted to the hospital, the infant ate normally and steadily gained weight.

On April 18, 2012, while A.C. was still at the hospital, the social services agency (SSA) placed him in protective custody. On April 20, SSA filed a detention petition for A.C.

The detention report listed the many warning signs of problems in the home. Along with A.C.'s diagnosed failure to thrive, the report noted mother's diagnosed postpartum depression and her complaint of auditory hallucinations. Father relayed that mother "does not show any interest in caring for the baby." The report also noted mother's report of having been twice physically abused by father, first during her pregnancy, when father slapped her face for buying the "wrong" tortillas, and then again on April 7 or 8, when father grabbed mother by the hair and dragged her while the baby was present.

The detention report noted that mother had not complied with the psychiatric medication regime prescribed for her, nor had she followed through on the referrals given to her as part of the agreed safety plan. She had also neglected to take A.C. to his pediatrician for scheduled appointments, preventing the doctor from adequately monitoring A.C.'s weight gain.

The report further noted that the maternal grandmother had multiple prior child abuse referrals and mother had been in foster care and group homes from the age of 13 through 18. Mother stated that she had suffered from depression since the age of 12 or 13, and had been prescribed psychotropic medication while in foster care.

At the April 23, 2012, detention hearing the court ordered reunification services and gave the parents separate, supervised visitation of two hours each, three times a week. Mother's visitation was conditioned on her keeping her psychiatric appointments and complying with her medication orders. Three days later, A.C. was placed in a foster home with a "non-relative extended family member," a placement that remained constant throughout these dependency proceedings.

3

The May 16, 2012, jurisdiction/disposition report and June 1 addendum noted some concerns with mother's visitation. (Because other alone contests the juvenile court orders, this statement of facts focuses on mother.) The caretaker, who monitored visitation, reported mother's apparent lack of concern when A.C. was ill (she refused to leave a party to bring a thermometer when A.C. had a fever), mother's disinterest in attending the baby's doctor visits, her admitted dislike for babies in general because they are "too small," her observed difficulties in changing A.C., and her impatience in feeding him.

At the June 4, 2012, combined jurisdiction/disposition hearing, mother pleaded no contest to the amended dependency petition alleging neglect through failure to protect (Welf. & Inst. Code, § 300, subd. (b)).[1] The court found that the cause of A.C.'s failure to thrive was environmental; that his parents had neglected the infant by failing to ensure he received "regular, frequent, and consistent feedings" and the medical care needed to address his lack of weight gain; that in early March 2012 mother was diagnosed with postpartum depression, with symptoms that included "lack of interest in caring for the child," but she "neglected to take her prescribed medication or seek continued treatment," placing A.C. at risk; that A.C. had been exposed to an act of domestic violence (the hair pulling and dragging incident) and the parents have "a conflictual relationship" which has escalated to physical violence, putting A.C. at risk of bodily harm.

The court adopted the recommended case plan objectives and responsibilities for mother that included completion of a domestic violence program (Personal Empowerment Program or PEP), general counseling, psychiatric treatment and compliance with the medication regime prescribed, and parenting education. The court

---

[1] All further statutory references are to the Welfare and Institutions Code.

continued the existing visitation plan (two-hour visits, three times per week), and set a six-month review for November 27, 2012.

In July 2012, father was arrested on charges of committing forcible sex offenses against mother. He remained incarcerated throughout the rest of these proceedings and he has chosen not to contest the dependency orders.

*Six-month Review*

A series of status review reports prepared for the six-month review hearing painted a disappointing picture of mother's compliance with her visitation and service plan.

During this six-month review period, mother did not participate in any counseling. She completed her parenting classes, but did not complete the entire 10-week PEP domestic violence program. She finished 7 of the 10 PEP classes by the end of November 2012, but waited until late January 2013 to complete the eighth class, and then failed to undertake the last two required classes.

Mother attended quarterly medication monitoring appointments (June, September and December of 2012) with a psychiatric nurse practitioner who diagnosed mother with "[m]ajor depressive disorder, recurrent episode," and noted mother's medication compliance was "[g]ood," with no side effects, and that mother felt the "medication is helping me." The treatment plan was to "[c]ontinue medication as prescribed." Despite that directive, mother stopped taking her antidepressants in January 2013 on her own initiative, without the approval of her psychiatric nurse practitioner, because she had become pregnant and was worried the drugs would harm her developing fetus.[2]

---

[2] The father of the unborn child was a man mother had begun dating in July 2012 — the month father was incarcerated. In mid-January 2013, a pregnant mother began living with this new boyfriend, but he was arrested and deported the next month.

5

Mother was inconsistent with visitation. In June 2012, she attended only 2 of 13 possible visits with A.C., and stayed for about 30 minutes or less at each visit. During the month of July, mother "visited an average of once to twice a week," rather than the allowable three times per week. In August, mother visited an average of once a week. While visiting A.C. during this three-month period, mother made minimal attempts to take care of the infant's needs, leaving A.C.'s feeding, diaper changes and clothes changes to the caretaker. On one visit in July, mother responded to the caretaker's description of A.C. having soiled his clothes and baby bouncer from diarrhea with the comment: "'I would have bathed him in cold water so he can learn.'"

In September 2012, mother made six of eight possible visits. Unlike the earlier visits monitored by the caretaker in the caretaker's home, a social worker monitored these visits at an agency office, and reported mother was "appropriate," "affectionate and playful with the child." At these visits, mother attended to the baby's needs and "interacted well" with him. A social worker made similar reports of the October visits, though noting that mother needed "prompting" to attend to the baby's needs for feeding and diaper changes.

Mother missed two visits during the first two weeks of November, and between November 27 and January 11, 2013, she missed 6 out of 20 possible visits. The social worker noted these visits were "good," that mother was appropriate and "very affectionate," and handled all feeding and diaper changes. The social worker noted, however, that mother often had to be "re-directed when feeding the child; she gives up easily when the child does not want to eat." To mother's "credit," the report noted that she "continues to demonstrate improvement" and "accepts suggestions well."

Between January 14 and February 6, 2013, mother missed 7 out of 11 visits, and she missed two more visits in the next two weeks. Since the beginning of the dependency case, mother never attended a single one of A.C.'s many medical

6

appointments, despite being encouraged by the social worker and caretaker to attend them.

In the weeks leading up to the six-month review hearing set for February 25, 2013, the assigned social worker tried repeatedly to contact mother to set up a meeting to discuss her case plan, but was unable to reach mother. The case worker left messages with the maternal grandmother, with whom mother had been living before moving out in mid-January 2013. The maternal grandmother promised to pass the messages on to mother, and later reported having done so. Nevertheless, mother did not contact the social worker.

Mother did not show up at the six-month review hearing on February 25, 2013. The court found mother had made "minimal" progress toward meeting the goals of her service plan, continued reunification services, and set a 12-month review for May 28, 2013.

*Twelve-month Review*

The social worker submitted a series of reports for the 12-month review that once again presented a picture of mother's inconsistent visitation and failure to commit fully to completion of her service plan during the period preceding the evidentiary hearing that began on July 25, 2013.

On February 25, 2013, mother called the social worker to explain that she had missed that day's six-month review hearing because she had overslept and, upon waking, could not find her clothes for court. Mother said that she was living with "a friend" because she could not get along with her mother, but she gave her mother's address for mailing purposes. Mother made an appointment to meet the social worker two days later, but failed to show up. The social worker tried to reach mother, but the maternal grandmother reported that her daughter had moved to an unidentified homeless shelter on March 5. The social worker did not hear from mother again until May 8, with the looming 12-month review hearing then set for May 28, 2013.

7

At that point, mother's visitation and service plan compliance since the six-month review was virtually nonexistent. Mother had not visited A.C. since February 25, 2013. After resurfacing on May 8, mother waited another two weeks to visit A.C. Her May 24, 2013 visit was her first contact with the child in three months. She had yet to attend a single medical appointment for A.C., and had not attended any of the therapy sessions the Regional Center provided to address the child's numerous, substantial developmental delays.

Mother had not yet begun any individual counseling. Nor had she yet completed the two PEP classes left unfinished in the last review period. (She did eventually complete the last two classes by the July 25, 2013, hearing.) Mother had unilaterally stopped taking her prescribed psychotropic medication in January 2013 due to her pregnancy — which she first revealed to her social worker in the May 8 phone call — and had neither resumed taking her medication nor met with her psychiatrist since her last appointment in December 2012.

After mother visited A.C. on May 24, 2013, her visitation continued to be inconsistent. She attended just four of eight possible visits in June, and failed to provide documentation to support her claim of having missed two visits for medical reasons. Her visits with the child, however, were positive: She was "appropriate," "affectionate" and "playful" with A.C., and fed and changed him.

During this review period, mother was expelled from two shelters for homeless pregnant women before moving into a third shelter just two days before the evidentiary hearing began on July 25, 2013. She stayed the longest at the first shelter, from March 5, 2013 to June 17, 2013, when she was asked to leave because she had spent a night away without permission. (Because this was her second unapproved overnight absence, the shelter rejected her excuse of having to babysit her younger sister while her mother was ill.)

8

While at shelter No.1, mother began individual counseling in June 2013, and completed two counseling sessions before being expelled from the shelter on June 17. Mother was at shelter No. 2 only briefly, from June 29 to July 8, 2013, when she was expelled for lacking identification. Her effort to obtain an identification card from the Department of Motor Vehicles was unsuccessful when she discovered she was a dollar short of the $8 cost after a three-hour wait in line.

She was admitted to shelter No. 3 on July 23, 2013. At the evidentiary hearing, her new case manager at the shelter, Rebecca Younger, was very positive about mother's compliance with shelter rules and programs during the two days she had been there. Younger explained that mother was in the shelter's one-year program for pregnant women, which included assistance with parenting, counseling, baby care, education or job planning, child care and housing, among other services. Mother was scheduled to begin individual counseling through the shelter.

When mother testified at the hearing, she had been at shelter No. 3 for nine days. She explained that she could have A.C. live with her at the shelter and she had all the supplies needed to have him in her care. She had signed a one-year contract with the shelter and was learning to be a better mother. She was attending the required Narcotics Anonymous meetings (though drug use was not among her problems) and parenting classes. She was set to begin individual counseling that week. The shelter provided full day preschool onsite.

At the conclusion of the evidentiary hearing, the court found that mother "has not regularly and consistently . . . participated in her visitation[,] nor has she made significant progress in resolving the problems that led to the child's . . . removal." The court noted the legal presumption that arises from a parent's failure to participate and progress in the case plan, and found that return of A.C. to mother would create a substantial risk of detriment to the child's well-being. The court further concluded that it could not find mother had the capacity to complete the case plan objectives and provide

9

for the child's safety, protection, physical and emotional well-being and special needs. The court ordered reunification services terminated and set a permanency plan hearing on December 11, 2013.

**DISCUSSION**

*A. Applicable Legal Standards*

At the 12-month review hearing, the court must return the child to the parent's physical custody unless the court finds, "by a preponderance of the evidence, that the return of the child . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (e).) Though SSA has the burden of proving such detriment, the statute provides that the parent's failure "to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental." (*Ibid.*) The court's finding of detriment is reviewed for substantial evidence. (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 763.)

If the court does not order the child returned to the parent at the 12-month review hearing, the court may continue reunification services "only if it finds that there is a substantial probability that the child will be returned to the physical custody" of the parent within 18 months of the date the child was originally removed from the home. (§ 366.21, subd. (g)(1).)

The statute limits the court's ability to extend services past the 12-month review by requiring the court to make three subordinate findings before concluding there is a substantial probability of return. The statute provides, in pertinent part, as follows: "[I]n order to find a substantial probability that the child will be returned to the physical custody of his or her parent [within the statutory timeframe] . . . , the court shall be required to find *all* of the following: (A) That the parent or legal guardian has consistently and regularly contacted and visited with the child. (B) That the parent or legal guardian has made significant progress in resolving problems that led to the child's

10

removal from the home. (C) The parent or legal guardian has demonstrated the capacity and ability both to complete the objectives of his or her treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs." (§ 366.21, subd. (g)(1)(A)-(C), italics added.) Again, the court's findings on each of these three questions is reviewed for substantial evidence. (*In re Shaundra L.* (1995) 33 Cal.App.4th 303, 316.)

In this writ proceeding, mother challenges the court's findings on two issues as lacking sufficient evidentiary support. The two findings are that return of A.C. to her custody would create a substantial risk of detriment to his well-being, and that there is no substantial probability of returning A.C. to her custody within the requisite 18-month time frame. As will be explained below, the record provides ample support for both findings.

B. *The Record Supports the Finding of Substantial Risk of Detriment*

Mother argues substantial evidence does not support the court's finding that returning A.C. to her custody would create a substantial risk of detriment to the child's physical or emotional well-being. More specifically, she contends that SSA "failed to demonstrate how A.C. would be at risk in mother's care." She points out that A.C. was removed from the home for three reasons: his diagnosed "failure to thrive," mother's postpartum depression and resulting "problems," and mother's "domestic violence relationship" with father. She contends that all three reasons are now resolved: A.C. is healthy and her positive visits with him demonstrate her ability to care for him in the shelter where she now resides; there is "no evidence of continued mental health problems" on her part, and she is no longer in a relationship with her batterer, father. She concludes that, because the initial reasons for detention are now resolved, there is no evidentiary basis for the court's finding of detriment.

Mother's argument is well off the mark. Fundamentally, she ignores the fact that her demonstrated failure "to participate regularly and make substantive progress

11

in court-ordered treatment programs" constituted "prima facie evidence that return would be detrimental," thereby shifting to mother the burden of proving that return would *not* be detrimental. (§ 366.21, subd. (e); *In re Cory M*. (1992) 2 Cal.App.4th 935, 949-950, superseded by statute on another point, as stated in *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1342.) The other defect in her argument is its premise: that her current circumstances prove that the reasons for removal no longer pertain, and, thus, there is no risk of detriment in returning A.C. to her custody. The court's finding to the contrary has solid support in the record.

*1. Mother Failed To Participate Regularly and Make Substantive Progress in Court-ordered Treatment Programs*

There were five components of mother's service plan and she failed to participate regularly or make *any* substantive progress as two of the five requirements. Specifically, though the service plan required that she obtain counseling, she made no effort to obtain any counseling until almost exactly a year later, in June of 2013, and even then she only attended two counseling sessions. That, clearly, is not "regular" participation, nor could it have resulted in "substantive progress," in the court-ordered counseling program. Additionally, the service plan required mother to cooperate with her treating psychiatrist and to take the psychiatric medication prescribed for her. Mother blatantly defied this requirement by unilaterally ceasing to take her prescribed antidepressant medication from January 2013 onward due to her pregnancy, and by failing to attend any further psychiatric appointments. SSA aptly contends this noncompliance with two crucial aspects of her service plan created "gaping holes in the safety net essential to little [A.C.'s] well[-]being."

SSA explained the significance of these two unmet requirements of the service plan by pointing to the grave danger A.C. faced as an infant in mother's care. At 10 weeks old, he was abnormally thin, with sunken eyes and protruding belly, because his mother's postpartum depression and resulting lack of interest in caring for her baby

12

left him seriously underfed and bereft of medical attention. A psychiatrist diagnosed mother as having "[m]ajor depressive disorder, recurrent episode" and prescribed antidepressants for improved functioning. When mother decided in January 2013 to stop taking her medication and to stop obtaining psychiatric care, she was subjecting A.C. to the risk of renewed neglect due to her untreated major depression. Additionally, the new pregnancy posed the risk of a future recurrence of the severe postpartum depression that caused her to neglect A.C. as an infant. At the 12-month review hearing, the court expressed concern about this very risk of "postpartum issues" stemming from the new pregnancy. It seems beyond debate that, together, the court-ordered psychiatric treatment and counseling services were measures that *could* have both enlightened mother as to the nature and scope of her mental health challenges and lessened the dangers her mental illness posed to a small child in her care.

Mother's petition does not dispute that she failed to comply with the psychiatric treatment/medication component of her service plan, but instead implicitly argues that her noncompliance should be excused as unnecessary. She asserts that "[t]here were no reported concerns of mother's mental health. There was no evidence presented at trial that mother's discontinuation of her medication to protect her [unborn] baby caused any adverse reactions." In effect, mother contends that, because no harm resulted from her avoidance of psychiatric treatment and medication, her failure to "participate regularly" in this particular court-ordered treatment program should not constitute prima facie evidence of detriment under section 366.21, subdivision (e).

But mother offers no authority for this novel assertion that a parent in a dependency proceeding can blithely ignore a court-ordered treatment plan and then avoid the consequence of that conduct by asserting the requirement was unreasonable or unnecessary. (See *In re Cory M.*, *supra*, 2 Cal.App.4th at pp. 949-950 [mother's "failure to follow the prescribed treatment program furnished prima facie evidence of detriment" notwithstanding mother's assertion that the order to take psychiatric medication was

13

unreasonable].) Mother's failure to participate regularly and make substantive progress in the court-ordered psychiatric treatment program furnished prima facie evidence that returning A.C. to her custody would cause detriment to his well-being. The same consequence flowed from her failure to participate regularly in counseling.

### 2. *Mother Failed to Disprove the Prima Facie Showing of Detriment*

Because mother did not comply with her case plan, the burden shifted to her to prove that returning A.C. to her care would *not* be detrimental. (*In re Cory M.*, *supra*, 2 Cal.App.4th at pp. 949-950.) Mother failed to meet that burden.

Mother's showing of lack of detriment consisted, essentially, of the following facts: She does not currently suffer from postpartum depression or any "continued mental health problems"; she currently enjoys loving and "affectionate" visits with A.C.; she currently lives in a shelter that can accommodate A.C. and assist her in caring for him and his newborn sibling; and she is no longer in a domestic violence relationship. All of these facts, taken together, do not dispel the risk of detriment in returning A.C. to mother that arises from her failure to obtain needed psychiatric treatment and counseling.

SSA persuasively argues that mother's conduct in stopping medication without consulting her psychiatrist, and then failing to attend any further psychiatric appointments, "was compelling evidence that she did not appreciate the risk her mental health problems presented and that she could not be relied upon to address them." Moreover, SSA contends that mother's failure to participate in regular counseling significantly increased the chance she would repeat her earlier dangerous behavior of living with an abuser or neglecting her child when depression overwhelms her. On the latter point, SSA asserts: "Absent significant progress in counseling[,] the court had no evidence that Mother appreciated the gravity of [A.C.'s medical] condition [at removal], her role in its exacerbation, or that she understood how to prevent future neglect and the importance of obtaining medical care."

14

It also bears noting that from initial detention through the 12-month review, mother never demonstrated a strong commitment to regaining custody of A.C. She delayed completing much of her service plan; for long stretches she failed to remain in contact with the social worker, and, most importantly, she was woefully inconsistent in visitation. Mother even went three months without seeing A.C. in the crucial period just before the original hearing date for the 12-month review.

Importantly, mother never attended any of A.C.'s medical appointments and attended just one of his therapy sessions, and then only for 30 minutes of the two-hour session. Given the child's significant developmental delays, mother's complete disinterest in learning how to help her son overcome these challenges is particularly distressing. The court remarked on mother's brief observance of a single therapy session as "going to some core aspects of this case . . . ."

In light of mother's failure to obtain needed psychiatric treatment and counseling, her history of half-hearted efforts at reunification only underscores the risk of detriment to the child were he returned to her custody. The record provides ample support for the court's finding of detriment.

C. *Substantial Evidence Supports the Finding of no Substantial Probability of Return Within 18 Months*

Mother also argues the court erred in terminating reunification services because there was a substantial probability A.C. would be returned to her custody within the 18-month statutory timeframe. She argues the court's finding of no such substantial probability lacks evidentiary support. Mother is wrong.

As explained above, the court may not extend reunification services absent a finding of a substantial probability the child will be returned to the parent's physical custody within 18 months of removal. (§ 366.21, subd. (g)(1).) That finding, in turn, depends on three subordinate findings, none of which the court made here. Specifically, the court must find the parent has maintained consistent and regular contact, has made

significant progress in resolving the problems that led to removal, and has demonstrated the "ability both to complete the objectives of his or her treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs." (§ 366.21, subd. (g)(1)(A)-(C),)

Our previous analysis of the evidentiary support for the court's detriment finding is equally applicable to the issues raised here. To recap, mother's failure to maintain consistent and regular contact with A.C. is beyond dispute. Similarly, mother did not make significant progress in resolving the problems that led to A.C.'s removal, given her rejection of psychiatric treatment and prescribed medication, and her failure to engage in counseling to address her past domestic violence experiences and the persistent mental illness that has plagued her since adolescence. Finally, mother's failure to commit to the hard work of regaining custody of A.C. demonstrated that she is not able to provide for A.C.'s well-being and special needs.

The trial court did not err in finding no substantial probability of A.C.'s timely return. Based on that finding, the trial court properly terminated reunification services and set the permanency planning hearing.

16

## DISPOSITION

The petition is denied.


THOMPSON, J.

WE CONCUR:


MOORE, ACTING P. J.


ARONSON, J.