Filed 5/5/16  In re Giovanna A. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re GIOVANNA A., a Person Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>TAMARAH S.,<br><br>    Objector and Appellant. | A145989<br><br>(San Francisco City and County Super. Ct. No. JD143182) |
| In re GIOVANNA A., a Person Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOHN S.,<br><br>    Objector and Appellant. | A146546<br><br>(San Francisco City and County Super. Ct. No. JD143182) |

The parents of Giovanna A. separately appeal from juvenile court orders terminating their parental rights.  Both contend the evidence does not support the trial court's finding that the child is adoptable; that the trial court erred in failing to apply the beneficial relationship exception to termination of parental rights; and that the notice

1

requirements of the Indian Child Welfare Act (ICWA) were not satisfied. We reject the first two arguments but conclude a conditional remand is required to assure compliance with ICWA.

## STATEMENT OF THE CASE AND FACTS

On May 19, 2014, the San Francisco Human Services Agency (Agency) filed a juvenile dependency petition alleging that Giovanna A. came within the provisions of Welfare and Institutions Code[1] section 300, subdivisions (b), (d), and (j). Giovanna was then two and a half years old. An older sister was in an open adoption in Washington State and, when Giovanna was detained, the mother was pregnant.

As subsequently amended, the petition alleged that the parents' relationship involved domestic violence, the child had been physically abused by the father and verbally abused by both parents; that the mother's history of domestic violence with the father, untreated mental health issues (including a diagnosis of bipolar disorder and schizophrenia) and untreated substance abuse issues required assessment and treatment; that the father had an untreated anger management problem, evidenced by violence in a prior relationship, as well as with the mother and the child, and a criminal history reflecting violence and substance abuse; and that the parents' older child had been provided a permanent plan of adoption.

The Agency's detention report described several reports of general neglect by the mother, and physical abuse and domestic violence by the father, in April and May. After a caller reported hearing the child crying all the time and being yelled at to "shut the fuck up," the parents told the protective service worker (PSW) in an interview that Giovanna was crying because of a bad diaper rash, for which she had been treated at San Francisco General Hospital; they said the child had been left for up to a week at a time with the paternal grandmother, who was too old to consistently change the child's diapers. The father said he was on probation for a misdemeanor due to his son having called the police

---

[1] Further statutory references will be to the Welfare and Institutions Code unless otherwise specified.

2

two months before saying the father was holding a knife to the mother, which both parents said was a lie told while the son was high on drugs. The father also disclosed having a domestic violence history with another woman he described as " 'crazy.' " The father had six convictions dating from 1991 to 2013, for offenses including misdemeanor vandalism, petty theft and threatening crime with intent to terrorize and felony first degree robbery.

The mother initially denied domestic violence, then a week later, reported that she went to a domestic violence shelter after the father hit Giovanna on her legs, arms and buttocks; a staff member indicated she was helping the mother obtain legal services to file for a restraining order and seek custody. The father denied yelling at or hitting the child and believed, contrary to the mother's report, that he and the mother were still together.

In May, the Agency received a report that the minor was wearing dirty clothes, her hair was uncombed, and the mother did not redirect her when she hit other children or ran up to strangers. The mother said she was seven months pregnant, was bipolar and schizophrenic, and had a history with methamphetamine eight years before. A week later, the mother was reported to have told staff at a shelter that she got a restraining order against the father because she did not like the way he "cusses at [the child] and spanks her." The family had spent the previous night together at the shelter because the mother did not show paperwork for the restraining order. The father was overheard spanking the child in a stall in the bathroom as she cried for him to stop, then telling her, "Shut the fuck up." The father told the PSW that he would tell the child to shut up when she ran around at night because he was afraid they would be kicked out of the shelter; he did not think it was abusive to tell her to shut up because this is how he was disciplined as a child. He said he had been staying at a men's shelter but the mother called him that night to come stay with her and Giovanna. The mother said she was afraid of the father due to domestic violence and was considering a restraining order. The PSW brought the mother and child to San Francisco General Hospital for the child's rash to be further evaluated. The mother became agitated when told her assigned PSW was coming to complete the

3

current investigation and she tried to leave with the child; when told she could not take the child without a safety plan in place, the mother tried to push the child in her stroller down a flight of concrete stairs. The mother continued to "decompensate emotionally," struggled with responding police officers, and was placed in handcuffs; the child was taken into protective custody.

At a hearing on May 20, Giovanna was detained and placed in foster care, and supervised visitation was ordered for the parents. A settlement conference regarding jurisdiction and disposition was set for June 18.

By June 12, the Agency had lost contact with the parents. The Agency's jurisdiction/disposition report filed on June 13 related that the parents initially engaged with the PSW and met with their respective case managers from the Homeless Prenatal Program, but then stopped responding to their case managers and their cases at the program were terminated. The father never appeared for visitation; the mother had one visit but then missed three consecutive visits and the center cancelled visitation. It was noted that "by all accounts, the parents appear to be homeless as they both provided their last known addresses as homeless shelters." The Agency had conducted a search and left messages for the parents at the Hamilton Family Center, where the social worker was told they had been staying for the past month, but neither parent returned the call.[2]

Giovanna appeared to be "developmentally on track physically." The foster parent reported that she was adjusting to the placement and that she did not speak in full sentences but with short words.

_____

[2] The PSW reported having "attempted to locate the parents by visiting their last known addresses to no avail," "attempted to contact with the parents on their respective telephone numbers to no avail," and "submitted a long search on behalf of the parents." The social worker who conducted the "parent search" requested by the PSW called the phone numbers listed for the parents multiple times and left messages but never received a return call. In addition to the messages left at the Hamilton Family Center, the social worker attempted to get a current address or phone number for the father from the San Francisco Probation Department but was unsuccessful because he was not on probation; and the social worker found a prior address the father had used for General Assistance and mailed a letter, but did not receive a response.

4

Both parents were present for the settlement conference on June 18 and submitted to the amended petition. Giovanna was declared a dependent, a reunification plan was adopted and dispositional findings were stayed until August 12. The court ordered supervised visitation for both parents once a week for three weeks, to be increased to twice a week if the parents appeared for all visits.

For more than six weeks after the June 18 court date, the parents did not contact the Agency to arrange visits, ask about Giovanna or request services. On July 7, they failed to attend a scheduled meeting with the PSW. The PSW twice attempted to locate the parents by walking around the public library; these efforts were unsuccessful, as were other attempts to locate them. The PSW tried to find the parents at Hamilton Family Center and was informed they were no longer residents; tried to reach them by telephone; and mailed letters to an address they had given the court and to the paternal grandmother, with whom the parents had previously resided and whom both identified as a primary support person.

The parents' new baby was born on August 2. The mother tested positive for cocaine on July 30 and August 2, and the new baby tested positive for cocaine at birth. The mother had not drug-tested since and denied using cocaine, saying a friend had laced her cigarette with cocaine without her knowledge. The baby was removed from the parents' custody on August 4.

After the new baby was removed, the PSW arranged visits with both the baby and Giovanna twice a week, and the parents visited consistently from August 18 until September 25, although the father was reported to have "trouble staying up" during visits and the staff and mother "would prompt [him] to stay awake." The parents then missed three consecutive visits and visitation was suspended.

As of December 4, 2014, when the Agency's status review report was filed, the PSW had not been able to contact the parents since September 25, despite sending additional letters, maintaining weekly contact with the paternal grandmother, and instituting another "parent search." The parents had been "extremely difficult to keep in contact with" and the PSW had only been able to meet with them when they visited the

5

children. On August 26, the parents had reported sleeping in the park outside the court, travelling with their belongings in a rolling suitcase and getting food at free community organizations. Both denied any domestic violence. The father had told the PSW that he had been diagnosed with schizophrenia at age 15 but did not agree with the diagnosis; he felt he might have bipolar disorder because he got angry easily and felt his mood can change easily; and as a child he had been prescribed Ritalin, which made him feel "crazy." He said his support network consisted of the mother, his mother and his sister. The mother said her support network consisted of the father and his mother. She had been adopted at age five by her special education teacher in Seattle and said she did not talk to her adopted family because she felt they "put her down" and made her feel like a bad mother.

The PSW encouraged the parents to enter Jelani House for housing and treatment, and provided them with information for the program several times in August. On September 18, the intake coordinator of Jelani House told the PSW that he had met with the parents and would be able to accept them into the program after they "detoxed": The father's breath reportedly smelled of alcohol and he "kept almost falling asleep" during the interview, they "did not look in good shape physically or mentally," and the coordinator wanted them to get medical and mental health evaluations. The PSW gave the parents this information and asked them to attend an orientation at Healthright 360, where they could be processed for inpatient treatment centers, but to the PSW's knowledge, the parents did not attend. At the time the status report was written, neither parent had initiated therapy or completed a parenting class.

Giovanna was living in a foster home with her infant sister and appeared to be close with her foster mother, who reported that Giovanna was also very close with the foster mother's mother. She had had difficulty adjusting to the foster home, refusing to bathe or shower and having daily tantrums, touching her vagina in public, and asking if the foster mother wanted to touch her vagina. It was determined she would benefit from "dyad therapy" and because the mother was not actively engaged in services, the foster

6

mother had been participating in weekly therapy with Giovanna. The therapist's preliminary diagnosis for Giovanna was "Adjustment Disorder with Anxiety."

By the time the status report was written, Giovanna was reportedly doing "extremely well" in her placement and her tantrums had decreased. A month after starting preschool, she was doing well and getting along well with peers; she was in the age-appropriate range for speech and language, was not eligible for "Individualized Education Program" services, and demonstrated good focus and concentration on occupational testing. The PSW described her as "an extremely friendly, giggly and sweet child." She could be "overly friendly with strangers" and had told the PSW and others she had just met that she loved them. Her foster mother was working on having Giovanna not hug everyone.

During the period when the parents were visiting, Giovanna was able to identify her parents, told them she loved them and asked to go with them when they were leaving. When she did not see her birth mother, she became confused about who her mother was and on one occasion told the PSW her foster mother was her mother. The Agency was exploring possible adoption by maternal relatives in Seattle but they did not feel able to take both Giovanna and her infant sister and the Agency did not want to separate the girls. The foster mother had expressed possible openness to adoption. The paternal grandmother had requested visitation, which was being arranged.

The PSW stated that the parents' inconsistency had been confusing for Giovanna who, at age three, needed to find a permanent placement as soon as possible so as to begin to attach to a primary caregiver. The Agency recommended that reunification services for the parents be terminated and that a section 366.26 hearing be set to implement a permanent plan for Giovanna.

At the contested six-month review hearing on January 29, 2015, the court heard testimony from the PSW and the mother; the father was present and his attorney cross-examined the witnesses. The PSW testified that the parents had their first therapy session on January 15, 2015. They had not completed a parenting class; the PSW had no information that they had obtained suitable housing; they had not visited Giovanna since

7

September 25; and they had not provided any evidence of having undergone psychological evaluations. The parents had contacted the PSW on December 6 seeking to restart visitation but the visitation center would not take them back because of their previous missed visits, meaning visitation had to be arranged through the family resource centers, which had a long wait list. The PSW had asked to have visits take place at the Agency office, and the first visit was scheduled for the following week.[3]

At the conclusion of the hearing, the juvenile court ordered that reunification services be terminated and set a section 366.26 selection and implementation hearing for May 27, 2015.

The father challenged the juvenile court's decision with a petition for extraordinary writ, which this court denied on April 21, 2015.

The Agency's report for the section 366.26 hearing, signed on April 24 and filed on May 8, recommended that the court find Giovanna adoptable and terminate parental rights. Now three and a half years old, Giovanna had had recent dental and physical exams. She was having some trouble at school identifying colors and counting but was able to identify objects and some animals. Her foster mother, who planned to adopt her, had concerns about her development and an appointment had been scheduled to address this. Giovanna had "abandonment issues" that she was working on in weekly therapy, and she was in dyadic therapy with her foster mother. The foster mother was concerned with Giovanna being "too friendly with [m]en" and Giovanna was "garnering support on mitigating mental/emotional issues in weekly therapy."

The parents had been visiting weekly since February 11, 2015. They seemed to have a good relationship with Giovanna, played games with her during visits and seemed to enjoy their time with her, and brought appropriate snacks, but there were "some

_____

[3] According to testimony at the hearing from the PSW and the mother, the mother had been in frequent contact with the PSW for the six weeks preceding the hearing and they had met once; the mother reported that she had been clean and sober for three months and had begun attending Narcotics Anonymous meetings and participating in substance abuse counseling. The mother had drug-tested on January 15 but then missed tests on three subsequent dates in January.

8

concerns" about the parents telling Giovanna she would be coming home. The foster mother reported that Giovanna had been having nightmares, waking up saying there were spiders in her bed, she drew a picture of her family in which all the people were "sad" and she stated that her "Mother was 'bad.' "

The Agency reported that the foster mother was "totally committed" to a permanent plan of adoption, and this plan was appropriate because the foster mother had "bonded with the minor" and "taken on the role of a parent in the minor's life," the minor and foster mother "get along wonderfully and the minor knows she can trust the caretaker/adoptive parent to assist her in a very consistent and caring manner." Giovanna had been placed with the foster mother for almost a year and the foster mother had demonstrated being "very capable" of meeting all the child's needs.

On May 26, however, the Agency filed an addendum report stating that Giovanna and her baby sister had both been removed from the foster mother's home on May 6 due to a report of physical abuse. During a "supervised therapeutic visit" on May 6, the mother had taken Giovanna to the bathroom and saw red marks on the child's thighs and bottom that looked like they could have been caused by a belt and a hand. Asked what happened, Giovanna responded, "Spanking." The Agency's assessment determined that both Giovanni and her sister were at high risk in the foster parent's home. Giovanna stated that she was hit by her " 'auntie' because she was 'bad.' " Giovanna was examined by a physician who found the marks on her leg consistent with a non-accidental injury but could not determine what object caused the injury. Both children were placed in a new fost/adopt home and the PSW was "working with the fost/adopt parents around adoption, and assessing what services they need in order to support both children in their home."

The section 366.26 hearing was rescheduled for August 11, and the Agency filed a second addendum report on July 28. Giovanna and her sister remained in the new fost/adopt home and the Agency was searching for relatives as well as assessing the current foster parent's willingness to adopt. The maternal grandmother had stated that while she was unable to adopt, there "may be other relatives who are interested."

9

Giovanna was "adjusting to the structure provided by the current caregivers" and doing well in preschool. She was attending weekly therapy with the same therapist, who stated that Giovanna suffered from attachment disorder and related that the first time she met Giovanna, the child told her she loved her and wanted to go home with her. The therapist reported seeing a positive change in the prior two weeks in that Giovanna was "engaged in treatment," more focused and "getting back to her normal self." The therapist stated that it would be best for Giovanna to gradually decrease her visits with her parents, first to twice a month for two months and then to once a month for two months.

The Agency maintained its recommendation of adoption as the appropriate permanent plan because Giovanna was adoptable, had been a dependent before the age of three and "deserves permanency as well as stability. The benefit of adoption outweighs the benefit of the limited parent-child relationship that could be realized in long term foster care or Legal Guardianship."

At the August 11 hearing, the PSW who had been assigned to the case in June 2015 testified that Giovanna is adoptable based on the facts that she was young, there were homes that could be recruited, and she needed stability and permanency. The PSW was not concerned about Giovanna's attachment disorder because the child was receiving services through therapy and a play group and "once she finds permanency and they continue to work with her, she'll continue to improve." The PSW noted that she had seen improvement in the two months since the change in Giovanna's placement.

On cross-examination by the father's attorney, the PSW testified that she had only observed a few minutes of one visit between Giovanna and the parents and her assessment of the parents' relationship with the child was based on the reports of the visitation supervisor and previous case managers. She knew the visits were "going well" and there were "no issues," but she did not "see a parental relationship" and she had not heard that Giovanna showed stress when she was not able to visit with her parents. The fact that the visits were supervised and only once a week for three hours indicated the relationship was "more of a visiting relationship than a parenting relationship."

10

Similarly, questioned by counsel for the mother, the PSW testified that the mother's visits were good and she played with the child; when asked if it was her understanding that the mother and child were bonded, the PSW responded, "I don't get that they're bonded. Once again, I see them as play dates pretty much. They see each other once a week for three hours. The child enjoys the visits. She enjoys the time, the attention." The PSW confirmed that during the last reporting period the mother had visited on a regular basis, as much as the court and Agency allowed. Sometime in June, Giovanna reported that her mother licked her, after which the mother was no longer allowed to take the child to the bathroom alone.

The PSW acknowledged an email dated June 2, 2015, from the new foster parent stating that Giovanna had asked for her mother several times and reporting feeling challenged by Giovanna's behavior and anticipating the transition would be difficult. The PSW testified that the email was written relatively soon after Giovanna was removed from the foster home where she had lived for almost a year, that some difficult times in transition were to be expected, and that the foster parents were mainly trying to understand what Giovanna's needs were in order to help her feel more comfortable in their home, and wondering how to answer Giovanna's questions. Asked if she thought Giovanna would benefit from maintaining her relationship with the mother, the PSW said she did not, explaining, "if parental rights are going to be terminated, I do think we should be cautious on how we begin transitioning the contact, but I don't think it would be beneficial to maintain the contact."

The PSW did not think a prospective adoptive family would need a special level of training because of Giovanna's attachment disorder but believed they would need to work with a professional in order to help the child. Asked if a prospective adoptive family would need a higher level of training to deal with Giovanna's inappropriately touching herself, the PSW replied that they would need to be sensitive to the child's needs and willing to "work with somebody." The Agency was still investigating possible relative adoption and the intent was to place the two children together.

11

The parents both testified that they had been visiting regularly since February, the visits were going well and their time with Giovanna was spent playing games. Giovanna asked about going home with the parents "all the time" and got very upset at the end of visits, crying and saying she wanted to go "home." The mother testified that this would start about an hour before the end of the visit, with Giovanna having "a fit," throwing things and saying she wants to go home with her, and that she was able to console Giovanna and calm her down. The father denied ever telling Giovanna she was going to come home with him but testified that his mother had said this to the child on the phone and that he had told his mother she could not do this. He testified that Giovanna called him "daddy" and he did not know her to call anyone else her dad. The mother testified that her bond with Giovanna meant more than anything to both of them. She denied ever licking Giovanna or touching her inappropriately.

At the conclusion of the evidence, counsel for the minor argued that the Agency had met its burden of proving Giovanna is adoptable and the parents had not met their burden of showing their relationship with her was so beneficial as to outweigh the benefit of adoption. The parents' attorneys both argued that the evidence showed there was a strong bond between parents and child, emphasizing Giovanna's asking for her mother when she was in distress and not wanting to leave her parents at the end of visits. Urging the court to order a 180-day continuance rather than immediate termination of parental rights, both noted that the Agency did not have an identified adoptive family and questioned the likelihood of adoption given the child's attachment disorder and the wisdom of terminating parental rights when the Agency was still investigating the possibility of placement with maternal relatives who might turn out to want a legal guardianship. Counsel for the Agency argued that the parents' concerns were speculative, the evidence showed Giovanna was adoptable and the Agency was seeking adoption, not guardianship. Acknowledging the parents' love for the child, counsel pointed out how young Giovanna was when the case began, the seriousness of the allegations, and the parents' failure to progress in their reunification plan, including the fact that they had never progressed beyond supervised visitation.

The court continued the matter in order to consider the arguments and review the reports. On August 14, the court found there was clear and convincing evidence the child would be adopted and the parents did not meet the burden of demonstrating termination of parental rights would be detrimental to the child. The court terminated the parents' parental rights and, in accordance with the therapist's recommendation, ordered visitation of up to two times a month for two months, then once a month for two months.

The parents each filed timely notices of appeal, the mother on August 14, and the father on October 7, 2015.

## DISCUSSION

### I.

"Once reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) "At the selection and implementation hearing held pursuant to section 366.26, a juvenile court must choose one of the several ' "possible alternative permanent plans for a minor child. . . . *The permanent plan preferred by the Legislature is adoption.* [Citation.]" [Citation.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child. [Citation.]' (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368, original italics.) There are only limited circumstances which permit the court to find a 'compelling reason for determining that termination [of parental rights] would be detrimental to the child.' (§ 366.26, subd. (c)(1)(B).) The party claiming the exception has the burden of establishing the existence of any circumstances which constitute an exception to termination of parental rights. (*In re Cristella C.* (1992) 6 Cal.App.4th 1363, 1373; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252; Cal. Rules of Court, rule 5.725(d)(4); Evid. Code, § 500.)" (*In re L.S.* (2014) 230 Cal.App.4th 1183, 1199.)

### A.

The parents contend there was insufficient evidence to support the juvenile court's finding that Giovanna would be adopted within a reasonable time. In their view, the court could not find the requisite clear and convincing evidence of adoptability because

13

there was no committed prospective adoptive parent at the time of the hearing and no certainty as to when such a parent would be identified, and the likelihood of the child being adopted was questionable due to her attachment disorder, other behavioral issues and desire to be with her parents.

"At the selection and implementation hearing under section 366.26, the trial court determines whether the child is adoptable on the basis of clear and convincing evidence. (§ 366.26, subd. (c)(1); *In re David H.* (1995) 33 Cal.App.4th 368, 378.)  On appeal, we review the factual basis for the trial court's finding of adoptability and termination of parental rights for substantial evidence.  (*In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1154.)  We therefore 'presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order.'  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)"  (*In re Josue G.* (2003) 106 Cal.App.4th 725, 732; *In re Cole C.* (2009) 174 Cal.App.4th 900, 916.)  The "clear and convincing" evidence standard " ' " 'requires a finding of high probability,' " ' " with evidence " ' " 'so clear as to leave no substantial doubt' " ' " and " ' " 'sufficiently strong to command the unhesitating assent of every reasonable mind.' " ' "  (*In re Carl R.* (2005) 128 Cal.App.4th 1051, 1060-1061 (*Carl R.*)  Still, "[a]lthough a finding of adoptability must be supported by clear and convincing evidence, it is nevertheless a low threshold:  The court must merely determine that it is 'likely' that the child will be adopted within a reasonable time.  (§ 366.26, subd. (c)(1); *In re Jayson T.* (2002) 97 Cal.App.4th 75, 84–85, disapproved on other grounds in *In re Zeth S.* (2003) 31 Cal.4th 396, 414.)  We review that finding only to determine whether there is evidence, contested or uncontested, from which a reasonable court could reach that conclusion.  It is irrelevant that there may be evidence which would support a contrary conclusion.  (*In re Casey D.* (1999) 70 Cal.App.4th 38, 53.)"  (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1292.)

The parents' focus on the fact that there was not an identified, committed adoptive family at the time of the hearing is misguided.  "The issue of adoptability posed in a section 366.26 hearing focuses on the *minor*, e.g., whether the minor's age, physical

14

condition, and emotional state make it difficult to find a person willing to adopt the minor. (See, e.g., *In re Cory M.* (1992) 2 Cal.App.4th 935, 951; *In re Jennilee T.* (1992) 3 Cal.App.4th 212, 224–225.) Hence, it is not necessary that the minor already be in a potential adoptive home or that there be a proposed adoptive parent 'waiting in the wings.' ([*Jennilee T.*], at p. 223, fn. 11; *In re Amelia S.* (1991) 229 Cal.App.3d 1060, 1065; see *In re Laura F.* (1983) 33 Cal.3d 826, 838.)" (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649-1650.) Section 366.26, subdivision (c)(1), expressly states, "The fact that the child is not yet placed in a preadoptive home nor with a relative or foster family who is prepared to adopt the child, shall not constitute a basis for the court to conclude that it is not likely the child will be adopted."[4]

Attributes indicating adoptability include young age, good physical and emotional health, intellectual growth and ability to develop interpersonal relationships. (*In re Gregory A.* (2005) 126 Cal.App.4th 1554, 1562.) Giovanna was young, not quite four years old at the time of the section 366.26 hearing, and physically healthy. She was described as "an extremely friendly, giggly and sweet child" and reportedly got along well with peers in preschool. She was not in need of Individualized Education Program services and on assessment had demonstrated good focus and concentration and age-appropriate speech and language. All of these factors pointed toward adoptability.

Not surprisingly, the evidence also indicated challenges. Giovanna was only two and a half years old when removed from her parents' custody. In her original placement, she initially struggled, to the point of daily tantrums and other behavioral issues, but six months later she was doing "extremely well" and had developed close relationships with

---

[4] The mother argues the Agency's assessment report was deficient for a number of reasons, including its focus on the failed placement as the prospective adoptive home. Giovanna was removed from this home shortly before the date originally scheduled for the section 366.26 hearing; the report had been prepared when the plan for adoption by the former foster mother appeared settled. To the extent the mother's challenge to the juvenile court's order is based specifically on deficiencies in the report—as opposed to a more general attack on the sufficiency of the evidence—her objections to the report were forfeited by her failure to object below to the adequacy of the report. (*In re A.A.* (2008) 167 Cal.App.4th 1292, 1317; *In re Brian P.* (2002) 99 Cal.App.4th 616, 623.)

the foster mother and grandmother. The foster mother had concerns about Giovanna's development and a medical appointment had been scheduled; the issues reported by the foster mother were that Giovanna "has problems at times following directions at school" and "has trouble at school identifying colors and counting." She was able to identify objects and some animals. Giovanna was working on "abandonment issues" in therapy, and was later diagnosed with an attachment disorder. After suffering physical abuse by the former foster mother with whom she had lived for almost a year, and with whom she had developed a close relationships, she was removed from that home and placed with a new family. A few weeks into the new placement, the new foster parents expressed feeling challenged by Giovanna's behavior and feeling the transition would be difficult. But after another month and a half, Giovanna was "adjusting to the structure provided by the current caregivers" and doing well in preschool, and her therapist reported seeing a positive change in the preceding weeks, with Giovanna more focused and "getting back to her normal self." The PSW testified that some difficulty with transition was to be expected in the circumstances, and that the challenges the foster parents had expressed mainly involved trying to understand what Giovanna's needs were in order to help her feel more comfortable in their home and wondering how to answer Giovanna's questions.

Noting that an adoptive parent would have to be willing and able to deal with Giovanna's "significant issues," the father contests the PSW's opinion that Giovanna was adoptable, urging that the PSW's belief Giovanna's attachment disorder would improve with therapy was undermined by her inability to describe what attachment disorder is, that the PSW acknowledged Giovanna exhibited tantrum behavior and sexualized behavior, that the Agency had not yet found an adoptive family for the child and did not know how long it would take to do so, and that things were not going smoothly with the present placement. He points to *Carl R.*, *supra*, 128 Cal.App.4th 1051, as an example of a case involving adoption of children with "special needs, developmental, or health challenges." That case involved a child with cerebral palsy, severe quadriparesis, a seizure disorder, and an uncontrolled and severe psychomotor delay, who was adoptable only because a particular family wanted to adopt him—a couple who had raised 40 to 45

16

special needs children over the course of more than three decades, and had two "total needs" adopted children. (*Id.* at pp. 1062, 1064.)

The father's reliance on *Carl R.* is somewhat perplexing. The issue in *Carl R.* was what inquiry should be engaged in to determine the adoptability of a child who could only be found adoptable because a particular family wanted to adopt him. Recognizing that as a rule the availability of prospective adoptive parents is irrelevant to the determination whether a child is generally adoptable, the court explained that "[t]o avoid rendering a total needs child a legal orphan, the assessment of the adoptability of such a child must necessarily include some consideration of whether the prospective adoptive parents can meet that child's needs." (*Id.* at p. 1062.) The father cannot reasonably be attempting to liken the degree of Giovanna's challenges with those of the child in *Carl R.*, who would need "total care for life." (*Carl R.*, *supra,* 128 Cal.App.4th at p. 1062.)

Cases cited by the mother are also inapt. In *In re Jerome D.* (2000) 84 Cal.App.4th 1200, the child was almost nine years old and the evidence showed a "parental" relationship with his mother, with whom he had lived for the first six and a half years of his life. (*Id.* at pp. 1206-1207.) The adoptability finding was based on the willingness to adopt of the mother's former boyfriend, who had a history of domestic violence with the mother. (*Id.* at p. 1203.) He had custody of his two children with the mother, who the mother would still be able to visit after termination of her parental rights to Jerome, and Jerome was observed to seem lonely, sad and the " 'odd child out' " in the former boyfriend's home. (*Id.* at pp. 1203, 1206.) The agency's assessment report, which recommended adoption by the former boyfriend, did not consider the child's continuing close relationship with the mother, the child's prosthetic eye, which required care and treatment, or the former boyfriend's criminal and child protective services history. (*Id.* at p. 1205.)

*In re Thomas* (2006) 145 Cal.App.4th 726, also involved children considerably older than Giovanna, ages 13 years and 8 years at the time of the section 366.25 hearing. The issue in that case was the parents' right to question Agency witnesses on the issue of adoptability. (*Id.* at p. 731.) After holding that the juvenile court erred in disallowing

17

cross-examination, the *Thomas* court found that in light of the foster parents' vacillation about whether to adopt the "otherwise hard-to-place sibling group," it could not find the error harmless.  (*Id.* at p. 734.)

In *In re Brian P., supra,* 99 Cal.App.4th at p. 625, although the child had " 'blossomed' " and made progress with the developmental delays that were evident when he entered foster care, at four and a half he had only recently learned to dress himself and his gait was " 'becoming less awkward' " (*Id.* at p. 620) and while his speech was improving, "he was unable to make a statement to his child welfare worker, who relied on facial expressions and gestures to infer that he was happy in his foster placement." (*Id.* at p. 625.)  His foster mother was not interested in adopting him; the Agency planned to look for an adoptive home and the assessment report offered only conclusory statements that he was adoptable.  (*Id.* at pp. 619, 624.)

Nothing in the present record suggests Giovanna is a child with problems so profound as to discourage adoption by all but one or even a few prospective families.  The failure of her placement with the former foster mother was not due to the foster mother not wanting to adopt Giovanna:  Until the physical abuse was discovered, the planned adoption appeared to be fully on track.  Contrary to the mother's statement that the current foster parents "backed out of their initial commitment to adopt Giovanna" after only three months of placement, emailing the social worker "about their lack of ability and commitment to meet Giovanna's needs,"  we see no indication in the record of either an initial commitment or a retraction.  The Agency's report shortly after the new placement was made stated that the PSW was "working with the fost/adopt parents, around adoption, and assessing what services they need in order to support both children in their home."  Two months later, the Agency was "assessing the current foster parent's willingness to provide the minor's [*sic*] with an adoptive home"; the PSW's follow up indicated that the concerns the current foster parents expressed toward the beginning of the placement primarily had to do with trying to make Giovanna more comfortable in their home;  and the Agency was also investigating the possibility of adoption by one of the maternal relatives.  Thus, the evidence at the hearing was simply that the current

family was interested in adoption but had not committed. The PSW who testified at the hearing, who had over 15 years experience as a PSW, did not view either Giovanna's attachment disorder or the prospect of placing her and her baby sister together as impediments to adoption, although an adoptive family would need to be willing to work with a professional to help Giovanna with the attachment disorder.[5]

The mother also strains the record in stating that Giovanna's attachment disorder "meant given the evidence in the record that the child was strongly bonded to her mother and unable to attach to a new caregiver." The mother's citations to the record document the therapist's statement that Giovanna suffered from attachment disorder and Giovanna's asking for her mother during her initial period in the new placement; nothing in the record supports a conclusion that the child was or would be unable to attach to a new caregiver. Giovanna struggled to adjust to her first foster home but formed close relationships with the foster mother and grandmother over the course of the year she spent in that placement; she then regressed when the discovery of physical abuse caused a change in placement but, in the period preceding the section 366.26 hearing, the PSW saw improvement and Giovanna's therapist reported that she was returning to her "normal self."

---

[5] The father seeks to undermine the PSW's testimony by pointing out that "[d]espite testifying Giovanna's attachment disorder was not a concern and could be dealt with in therapy, [the PSW] was unable to describe for the juvenile court what detachment [*sic*] disorder is." Asked on cross examination to describe what attachment disorder is, the PSW replied, "I'm not a therapist, but my understanding of what an attachment disorder is that—you know, I can't do it. I can't. No, I really can't." Counsel for the mother then asked, "Okay. So it's not within your experience and professional work history to be familiar with attachment disorder?" The PSW responded, "I am familiar with them. But to describe it, I'm finding difficulty doing that for you. Yes." The PSW went on to state that she did not believe an adoptive family would need "a specialized level of training" for a child with attachment disorder but the family "would need to work with the minor and a professional in order to help her with it."

In our view, the PSW's testimony does not reflect a lack of understanding of the attachment disorder but rather a feeling of insufficient expertise to properly define it for the court.

As is hardly unusual among dependency cases, this one involves a child in need of ongoing mental health therapy to deal with the psychological and emotional consequences of the trauma she experienced in her early life. Giovanna suffered through the transition from the custody of her parents and life in homeless shelters to the home of her first foster mother, only to be subjected to physical abuse at the hands of the foster parent with whom she had established a good relationship over the course of almost a year. Unsurprisingly, she regressed during the transition to a new foster home. But she was already showing the signs of recovery—in the words of her therapist, returning to her normal self. In short, while her needs were clearly real, there was no evidence they were of the severity that would dissuade a prospective parent: She was very young, she had demonstrated the ability to form a close bond with a caretaker, she got along well with peers, and her intellectual abilities were age-appropriate. As we have said, the presence of an identified and committed adoptive parent is not essential to a finding of adoptability. (*In re Sarah M., supra,* 22 Cal.App.4th at pp. 1649-1650.) The PSW, with many years experience, believed an adoptive family would be found, whether the present foster parents, a maternal relative or another as yet unidentified. The evidence was sufficient to support the juvenile court's determination that clear and convincing evidence showed Giovanna was likely to be adopted within a reasonable time.

### B.

The parents both argue that the evidence did not support the juvenile court's rejection of the beneficial parent child relationship exception to termination of parental rights. As relevant here, section 366.26, subdivision (c)(1)(B), provides that if the court determines it is likely the child will be adopted, "the court shall terminate parental rights and order the child placed for adoption" unless "[t]he court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) [t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."

The appropriate standard of review for the juvenile court's decision on application of this exception is unsettled, with some cases conducting a substantial evidence review

20

(e.g., *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576), others a review for abuse of discretion (e.g., *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351) and others a combination of the two (e.g., *In re J.C.* (2014) 226 Cal.App.4th 503, 530–531). The practical differences among these approaches are not significant, as both the substantial evidence and abuse of discretion tests require " '[b]road deference . . . to the trial judge.' " (*In re Jasmine D.*, at p. 1351.) Here, we find no error under either standard.

"The 'benefit' prong of the exception requires the parent to prove his or her relationship with the child 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' " (*In re K.P.* (2012) 203 Cal.App.4th 614, 621, quoting *In re Autumn H.*, *supra,* 27 Cal.App.4th at p. 575.) "No matter how loving and frequent the contact, and notwithstanding the existence of an 'emotional bond' with the child, 'the parents must show that they occupy "a parental role" in the child's life.' " (*In re K.P.*, at p. 621, quoting *In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108.) The relationship must be "parental," not just "friendly or familiar." (*In re Jasmine D.*, *supra,* 78 Cal.App.4th at p. 1350.) "Interaction between natural parent and child will always confer some incidental benefit to the child." (*In re Autumn H.,* at p. 575.) To come within the statutory exception, the relationship must "promote[ ] the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Ibid.*)

In determining the applicability of the exception, the juvenile court must "balance[] the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575.) But "a child should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be beneficial to some degree but does not meet the child's need for a parent." (*In re Jasmine*

21

*D., supra,* 78 Cal.App.4th at p. 1350.) "Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*Ibid.*)

The mother maintains she met both prongs of the statutory exception (regular visitation and benefit to child from continuing relationship) because she visited Giovanna regularly during the last review period and Giovanna's strong bond to her was evidenced by the court's order for a four-month gradually decreasing visitation plan. Legal guardianship would be a more appropriate permanent plan, she argues, because it would allow a stable placement for Giovanna but ensure continuing contact with her biological family. The father, similarly, urges that the court found the parents had visited regularly and the record documents the positive and loving relationship between Giovanna and the parents. The father points out that the reports of Giovanna having nightmares after visits with the parents came from the first foster mother, who was trying to adopt Giovanna and her sister at the time, and that it was the mother who discovered and reported that foster mother's physical abuse of the child. He stresses that Giovanna's positive relationships with the parents have been her only consistently positive adult relationships throughout the dependency, and that these relationships should not be sacrificed for an uncertain plan of adoption by an as yet unidentified person.

The record reflects that Giovanna enjoyed her visits with her parents: By their account and the Agency's, the parents had a "good relationship" with Giovanna and enjoyed playing with her at visits. Sadly, this is not enough. The regular visitation that the juvenile court acknowledged did not begin until after the parents' reunification services had been terminated and consisted of only a single three-hour supervised visit per week. When Giovanna was first removed from the parents, mother appeared for visitation only once and father not at all. When the child was declared a dependent, the court ordered supervised visitation once a week, to be increased to twice a week if the parents appeared for all visits, but the parents failed to visit for almost two months, beginning to visit only after their infant was born in August 2014. After about five weeks

of twice-weekly visits, the parents stopped visiting after September 25 and did not contact the PSW to restart visitation until December.

It is true, as was pointed out at the hearing, that from February 11 until the hearing in August, the parents visited as much as the court and Agency permitted. But it was the parents' failure to engage earlier in the dependency that prevented them from being able to progress beyond limited supervised visitation. As described in the Agency's reports and the PSW's testimony, the parents' relationship with Giovanna was good, but it was not "parental" within the meaning of the statutory exception. In the PSW words, the relationship was of a "visiting" nature rather than a "parenting" one; the visits were like "play dates" in which the child "enjoy[ed] the time, the attention."

At less than four years of age, Giovanna had spent her life enduring or recovering from trauma, first having to be removed from her parents due to their inability to care for her and then being subjected to abuse by the adult with whom she had formed a new bond. She deserves a stable, permanent placement. Whether framed as substantial evidence to support the juvenile court's decision or as the absence of an abuse of discretion, we have no basis for disturbing the court's determination that the parents failed to meet their burden of demonstrating that their relationship with Giovanna was so important to her well-being as to outweigh the benefit she would derive from adoption.

## II.

The parents also argue the Agency and the court did not sufficiently comply with the notice requirements of ICWA. Although the Agency sent notice to the tribes through which the parents reported having Indian heritage, the parents maintain the notices contained insufficient information to enable the tribes to make an informed determination.

"ICWA protects the interests of Indian children and promotes the stability and security of Indian tribes by establishing minimum standards for, and permitting tribal participation in, dependency actions. (25 U.S.C. § 1901 et seq.; *In re Holly B*. (2009) 172 Cal.App.4th 1261, 1266.)" (*In re A.G.* (2012) 204 Cal.App.4th 1390, 1396.) "An ' "Indian child" ' is an unmarried person under 18 who is either a member of an Indian

23

tribe or is eligible for membership and is the biological child of a tribe member.  (25 U.S.C. § 1903(4).)" (*In re W.B.* (2012) 55 Cal.4th 30, 49.)

"If there is reason to believe a child that is the subject of a dependency proceeding is an Indian child, ICWA requires that the child's Indian tribe be notified of the proceeding and its right to intervene.  (25 U.S.C. § 1912(a); see also . . . § 224.3, subd. (b).)  [¶]  Notice is a key component of the congressional goal to protect and preserve Indian tribes and Indian families.  Notice ensures the tribe will be afforded the opportunity to assert its rights under the Act irrespective of the position of the parents, Indian custodian or state agencies.  Specifically, the tribe has the right to obtain jurisdiction over the proceedings by transfer to the tribal court or may intervene in the state court proceedings.  Without notice, these important rights granted by the Act would become meaningless.' (*In re Kahlen W.* (1991) 233 Cal.App.3d 1414, 1421.)" (*In re A.G., supra,* 204 Cal.App.4th at p. 1396.)  "The burden is on the Agency to obtain all possible information about the minor's potential Indian background and provide that information to the relevant tribe or, if the tribe is unknown, to the [Bureau of Indian Affairs (BIA)]." (*In re Louis S.* (2004) 117 Cal.App.4th 622, 630.)  "Because of their critical importance, ICWA's notice requirements are strictly construed.  (*In re Robert A.* (2007) 147 Cal.App.4th 982, 989.)" (*In re A.G.,* at p. 1397.)  And because notice serves the interests of Indian tribes, ICWA notice issues are not forfeited by a parent's failure to raise the issue in the juvenile court.  (*In re Z.N.* (2009) 181 Cal.App.4th 282, 296-297; *In re Justin S.* (2007) 150 Cal.App.4th 1426, 1435.)

"[F]ederal and state law require that the notice sent to the potentially concerned tribes include 'available information about the maternal and paternal grandparents and great-grandparents, including maiden, married and former names or aliases; birthdates; place of birth and death; current and former addresses; tribal enrollment numbers; and other identifying data.' (*In re Francisco W.* (2006) 139 Cal.App.4th 695, 703; see *In re Mary G.* (2007) 151 Cal.App.4th 184, 209.)" (*In re A.G., supra,* 204 Cal.App.4th at p. 1396; § 224.2, subd. (a)(5)(C).)  The Agency "has an affirmative and continuing duty to inquire about, and if possible obtain, this information.  (*In re S.M.* (2004) 118

Cal.App.4th 1108; § 224.2, subd. (a)(5)(C); 25 C.F.R. § 23.11(d)(3); [Cal. Rules of Court,] rule 5.481(a)(4).) Thus, a social worker who knows or has reason to know the child is Indian 'is required to make further inquiry regarding the possible Indian status of the child, and to do so as soon as practicable, by interviewing the parents, Indian custodian, and extended family members to gather the information required in paragraph (5) of subdivision (a) of Section 224.2 . . . .' (§ 224.3, subd. (c).)" (*In re A.G.,* at p. 1396; *In re C.Y.* (2012) 208 Cal.App.4th 34, 39.) But "neither the court nor [Department of Health and Human Services] is required to conduct a comprehensive investigation into the minors' Indian status. (*In re S.B.* (2005) 130 Cal.App.4th 1148, 1161; *In re Levi U.* [(2000)] 78 Cal.App.4th 191, 199 [no duty to 'cast about' for information].)" (*In re C.Y.,* at p. 39.)

" 'The [trial] court must determine whether proper notice was given under ICWA and whether ICWA applies to the proceedings. [Citation]. We review the trial court's findings for substantial evidence. [Citation.]' (*In re E.W.* (2009) 170 Cal.App.4th 396, 403–404.)" (*In re Christian P.* (2012) 208 Cal.App.4th 437, 451.) "Substantial compliance with the notice requirements of ICWA is sufficient." (*In re Christopher I.* (2003) 106 Cal.App.4th 533, 566.) "[W]here notice has been received by the tribe, . . . errors or omissions in the notice are reviewed under the harmless error standard." (*In re E.W.*, at pp. 402-403.)

Here, the Agency's Detention/Jurisdiction report attached a "Indian Child Inquiry" form (ICWA-010) for father indicating that he had told the PSW his grandfather "has some Cherokee." A "Parental Notification of Indian Status" form (ICWA-020) filed two days after the report stated that a lineal ancestor is or was a member of a federally recognized Indian tribe, listing the tribe as Cherokee and the ancestor's name as John Anderson. An ICWA-020 for the mother stated she was or might be a member or eligible for membership in a federally recognized Indian tribe, listing the tribe's name as Chippewa "in Minnesota." At the detention hearing, the parents were ordered to provide the Agency "any information re: ICWA."

25

On July 10, 2014, the Agency mailed an ICWA notice form (ICWA-030) providing notice of the dependency action and a hearing set for August 12, 2014, to the Cherokee Nation, Eastern Band of Cherokee Indians, and United Keetoowah Band of Cherokee. The ICWA-030 notice provided the parents' names and birth dates but indicated "no information available" in the spaces provided for information about grandparents and great-grandparents. Both parents' ICWA-020 forms were attached. On July 23, 2014, the Agency mailed the ICWA-030 notice to 24 Chippewa tribes or bands, as well as the Sacramento Area Director of the Bureau of Indian Affairs and the three previously listed Cherokee tribes. The Agency received responses from all the Cherokee tribes and all but five of the Chippewa; all that responded stated the child was not enrolled or eligible for enrollment.[6]

Father contends that the notice given by the Agency was deficient in that it did not provide any information about Giovanna's grandparents or great-grandparents, despite the fact that the Agency had access to at least some of the information. The detention report referred to the paternal grandmother, Marie Anderson, by name, but on the ICWA-030 form, the space for paternal grandmother read "no information available." And while father's ICWA-010 inquiry indicated Cherokee ancestry traced through his grandfather, and the ICWA-020 identified the name of this ancestor, the ICWA-030 notice stated "Unknown Unknown" in the space for paternal grandfather. Father urges that the record reflects no effort by the Agency to gather the missing information despite several of the tribes responding that the notice they received did not provide sufficient information to make a determination.[7] He points out that the Agency's status report

---

[6] The Agency filed certified return receipts for all entities to whom notice was sent, including those that did not respond.

[7] One tribe responded, "Not enough family history." Another responded, "Not a member" and "Information still needed: To make another determination, full names and dates of birth of biological Indian grandparents, great-grandparents, etc." Another stated that Giovanna did not meet the statutory definition of Indian child but that a claim could not be validated or invalidated without the information for direct biological relatives, and directed where further information could be sent.

26

documents the PSW having spoken with each of the parents about their family members and support systems on August 26, 2014, but does not indicate the PSW used this opportunity to collect information for the ICWA notice. The same report documents the PSW having spoken directly with both the maternal and paternal grandmothers, and referred to the maternal grandmother by name, yet these names were not included on the ICWA notices and there is no indication the Agency sought information from these sources for the ICWA inquiry. Mother, too, points to the Agency's failure to seek the missing information from the parents or the paternal and maternal grandmothers, with whom the PSW had contact. She also urges that the Agency could have accessed information about her biological family through her dependency file.

The Agency asserts that the failure to provide information about the paternal grandmother was harmless error because the father claimed Indian ancestry through his grandfather. As to the paternal grandfather, while the notice form erroneously stated "Unknown Unknown" for the name of the paternal grandfather, the ICWA-020 was attached to the notice. That form stated that one of father's lineal ancestors is or was a member of the Cherokee tribe and named the ancestor as "John Anderson." Thus, the Agency maintains the tribes had actual notice of "the information father provided" to the PSW.

This much may be true, but the "actual notice" at most was only of the name of the claimed ancestor. The responses received from the noticed Cherokee tribes made clear that their records searches were based on the information with which they were provided, and that any incorrect or omitted family documentation could invalidate the determination. Two of the tribes responded that they had searched their records *based on the information received* from the Agency. The third additionally stated that it was impossible to validate or invalidate a claim of Cherokee heritage without the full names and birthdates of the relevant direct biological ancestors. The critical question is whether the Agency was obliged to do more to discover the additional information about the paternal grandfather necessary for the tribes to conduct a meaningful search.

As we have said, a social worker who has reason to know the child is Indian is required to make further inquiry by interviewing extended family members. (*In re A.G., supra,* 204 Cal.App.4th at p. 1396; § 224.3, subd. (c); Cal. Rules of Court, rule 5.481(a)(4)(a).) In *In re A.G.,* the ICWA notices provided the mother's name and birth date, the father's name, former address and birth date, and the paternal grandmother's name and address, but no information for other relatives. The court stated, "Moreover, there is no indication in the Agency's reports of any effort to investigate A.G.'s Indian heritage. The detention report states that Father reported Native American ancestry in his family and that '[h]e is gathering more information regarding tribal affiliation and will let the undersigned know once he has more information,' but, despite the Agency's continuing duty of inquiry (§ 224.3, subd. (a); *In re J.D.* (2010) 189 Cal.App.4th 118, 123), there is no indication that it followed up with Father to find out what he might have learned. Nor, apparently, was any effort made to interview any of Father's immediate or extended family members about A.G.'s Indian heritage. These failures are all the more puzzling because several of Father's family members, including his mother, his brother, an aunt and a great-aunt were involved in the proceedings and/or in contact with the Agency. Yet there is no indication that the Agency interviewed them about A.G.'s Indian heritage, and it indisputably failed to identify even these known family members in its notices to the tribes. Error is obvious." (*In re A.G., supra,* 204 Cal.App.4th at p. 1397.)

Similarly, in *In re D.T.* (2003) 113 Cal.App.4th 1449, 1455, "the notices failed to include information already known to the social worker, such as appellant's married name, the parents' current addresses, the names of the minors' grandparents, and that the claimed tribal affiliation was Cherokee. All of this information was contained in the social worker's dispositional report." Further, "[t]he record does not disclose any inquiry of the father after he informed the court at the detention hearing that he had Cherokee heritage. And it cannot be implied from the fact that appellant could not trace her ancestors back to 1900 that she could provide no additional information about her parents or grandparents. Although the court instructed the parents to provide the social worker with 'any and all information that you have or can reasonably give' regarding Indian

28

ancestry, there is nothing in the record to indicate that the parents were ever told, specifically, what information was relevant to this inquiry." (*Ibid.*; see *In re Francisco W.*, *supra*, 139 Cal.App.4th at pp. 701, 703-704 [paternal grandmother reported Cherokee heritage; paternal grandparents' birthdates and birth places omitted from notices even though "Agency easily could have contacted the paternal grandmother for additional pertinent information" because she "had made herself available"]; *In re Jennifer A.* (2002) 103 Cal.App.4th 692, 705 [notice listed parents' birthplaces as unknown and birthplace of child as California; parents "were participating in the proceedings and may have been available to provide information about their birthplaces"].)

Here, although the parents were difficult to maintain contact with, they were present for each of the hearings, but the record reflects no effort to obtain further information from them about the Indian ancestry each claimed. Further, the Agency's reports document that the PSW was in touch with the paternal grandmother, maintaining weekly contact with her during a period when the Agency was trying to locate father. Yet there is no indication any effort was made to follow up on the information father had provided by seeking additional information from the paternal grandmother—even though it was the paternal grandfather who father named as his Indian ancestor. It does not seem unduly speculative to imagine that the paternal grandmother would have been able to provide at least the paternal grandfather's birthdate, if not his place of birth or further details concerning his Indian ancestry.

In this respect the Agency's reliance upon *In re Gerardo A.* (2004) 119 Cal.App.4th 988, 995, is misplaced. In *In re Gerardo A.*, the social services department knew from the mother and her sister that the maternal grandparents had Indian ancestry, as well as other information including that the mother had an enrollment number with the BIA and received certain services through the BIA and an Indian health association. (*Id.* at pp. 991-992.) The father claimed the social worker should have sought additional information (such as "birthplaces and/or birthdates for those listed on the request-for-confirmation form whose birthplaces and/or birthdates were noted as "unk" or unknown") from the maternal grandmother or other older maternal relatives. (*Id.* at

29

p. 995.)  Rejecting this claim as based on speculation, the court stated that the fact the record did not document the social worker having spoken with anyone other than the mother and maternal aunt did "not necessarily mean the department failed to make an adequate inquiry for Indian heritage information" and that there was no basis in the record to assume maternal relatives were available to be interviewed and could have supplied the missing information.  (*Id.* at pp. 994-995.)  Unlike the present case, in *In re Gerardo A.*, the department had considerable information about the maternal family's connections to Indian tribes, which it obtained not only from the initial interview with the mother and aunt but from subsequent interviews with the mother and other sources.  The department had clearly followed up on the initial report of Indian heritage with additional interviews and the court declined to assume additional relatives would have been available for interview and in possession of additional information.  Here, after the initial interviews with the parents, there is no indication the Agency followed up either with the parents or with the paternal grandmother, with whom the PSW was in regular contact.

As we have said, where notice has been received by the tribe, deficiencies in the content of the notice are reviewed under the harmless error standard.  (*In re E.W., supra,* 170 Cal.App.4th at p. 403.)  A notice that provides inaccurate or incomplete information does not permit the tribe a meaningful opportunity to investigate its records for information about the relevant person.  (*In re Louis S., supra,* 117 Cal.App.4th at p. 631 [misspelled names, information provided in wrong part of form, missing birthdates].)  Here, although father had told the PSW his grandfather "had some Cherokee," on the notice form sent to the Cherokee tribes the Agency inserted "Unknown Unknown" in the space for paternal grandfather's name—even as it attached the separate ICWA-020 providing that name.  The Agency listed "[n]o information available" for all other information about this ancestor, although it is reasonable to assume it could have obtained at least a birth date from the paternal grandmother, with whom the PSW was actively in contact.  It would be one thing if the Agency had attempted to obtain further information about the paternal grandfather and been unable to do so.  But even crediting the Agency with having supplied the name of the relevant ancestor despite its failure to

30

provide that information in the proper place on the form, the Agency failed to supply any other information—despite being reminded by the tribes' responses that any "incorrect or omitted family documentation could invalidate" the tribe's determination  and it was "impossible to validate or invalidate a claim of Cherokee heritage" without at least the full name *and date of birth* of the relevant ancestor, and despite the Agency's ready access to the paternal grandmother as a likely source for the missing information.  We cannot find the error in notices to the Cherokee tribes harmless.

The parents additionally argue notice was insufficient with respect to mother's claimed Indian heritage.  The Agency's reports reflect that the PSW was in contact with the maternal grandmother and aunts.  These relatives were mother's adoptive family, who would not necessarily be expected to have information about the ancestry of her biological family.  Still, especially since mother was adopted as a dependent child for whom an ICWA inquiry should have been required, there was no reason for the Agency to forego even inquiring into these relatives' knowledge of mother's possible Indian heritage.  (See *In re C.Y., supra,* 208 Cal.App.4th at p. 40 [court asked mother's adoptive father about mother's Indian heritage and biological parents].)

Mother further asserts that information on her biological family could have been accessed through the file for her dependency as a minor.  *In re C.Y., supra,* 208 Cal.App.4th at pages 38-39, rejected a similar argument.  There, the mother, who had been adopted, indicated she might have Indian ancestry and argued the social services agency should have attempted to discover the name of the tribe through her adoption records.  The court rejected this suggestion as going "far beyond what is reasonable or appropriate.  [The Agency] must inquire as to possible Indian ancestry and act on any information it receive[d], but it has no duty to conduct an extensive independent investigation for information." (*Id.* at p. 41.)  The court noted that ICWA specifically provided a means for the mother to obtain information about her Indian ancestry from her own adoption records:  " '*Upon application by an Indian individual who has reached the age of eighteen and who was the subject of an adoptive placement,* the court which entered the final decree shall inform such individual of the tribal affiliation, if any, of the

31

individual's biological parents and provide such other information as may be necessary to protect any rights flowing from the individual's tribal relationship.' (25 U.S.C. § 1917; italics added.)" (*In re C.Y.,* at p. 41.)

Mother's suggestion here that the Agency could have obtained information about her biological family from her dependency file calls for a similarly unreasonable "extensive independent investigation." (*In re C.Y., supra,* 208 Cal.App.4th at p. 41.) Mother cites neither legal authority establishing the Agency would have a right to obtain information from a decades-old dependency file in a different state, nor a factual basis for assuming the records still existed more than 10 years after mother reached the age of majority. (See *In re J.T.* (2007) 154 Cal.App.4th 986, 990 ["Mother's adoption file was not available because all files were destroyed after a dependent child turned age 28 years old"].)

Since the relative specifically identified as having Indian ancestry was the paternal grandfather, the most significant problem with the notice in the present case is Agency's failure to inquire into information such as his date and place of birth and to properly present the information it had on the ICWA-030 notice form. (See *In re Louis, supra,* 117 Cal.App.4th at p. 631 ["[a]gency must provide all known information to the tribe, particularly that of the person with the alleged Indian heritage"].) But the notices generally reflect an overly cursory approach to the notice requirement. Aside from the inadequate inquiries and deficiencies in notice we have discussed, the Agency failed to include in the notices other information that was in its possession (the paternal grandmother's name and address) or, presumably, could have been obtained easily from the parents or paternal grandmother (parents' birth places, paternal grandmother's date and place of birth). As we have commented before, "[n]oncompliance with ICWA has been a continuing problem in juvenile dependency proceedings conducted in this state, and, by not adhering to this legal requirement, we do a disservice to those vulnerable minors whose welfare we are statutorily mandated to protect." (*In re I.G.* (2005) 133 Cal.App.4th 1246, 1254.) "Delays caused by the Department's failure to assure compliance with the law are contrary to the stated purpose of the dependency laws, to

promptly resolve cases (*In re Marilyn H.*[, *supra*,] 5 Cal.4th [at pp.] 307, 309) and to provide dependent children with protection, safety and stability. (*Id.* at p. 307; Welf. & Inst. Code, § 202.)" (*Justin L. v. Superior Court* (2008) 165 Cal.App.4th 1406, 1410.) This case is yet another in which the Agency's failure to attend carefully to its responsibility for providing *meaningful* notice of child custody proceedings will unnecessarily delay the objective that should be paramount—achieving a stable and permanent home for Giovanna.

## DISPOSITION

The orders terminating the parents' parental rights to Giovanna are reversed. The juvenile court is directed to order the Agency to make further inquiry into the parents' and grandparents' Indian heritage consistent with the views expressed in this opinion, and, if additional relevant information is obtained, provide corrected ICWA notices to the relevant tribes. If a tribe intervenes after receiving proper notice, the court shall proceed in accordance with ICWA. If no tribes intervene after receiving proper notice, the order terminating parental rights shall be reinstated. If, after investigation, the Agency is unable to obtain additional relevant information, no further notice shall be required and the order terminating parental rights shall be reinstated.

                                                  _____

                                                  Kline, P.J.

We concur:


_____

Richman, J.


_____

Stewart, J.


*In re Giovanna A.* (A145989, A146546)